MARBLE COMPANY *v.* RIPLEY.

1. Equity will enjoin one partner from violating the rights of his copartner in partnership matters, although no dissolution of the partnership be contemplated.
2. Where a person makes an entry on land owned by others jointly interested with him in working it, but which is held by these last subject to a right of entry and possession in him, for failure or refusal by them to fulfil certain conditions and stipulations about the products of the land, which they have covenanted to fulfil, so that *primâ facie* his entry is a deforcement of the owners and an invasion of their rights

as such, the burden is on the party entering to show that his entry was justifiable.

3. Where a deed from one owner conveyed quarry lanos to his co-owners, reserving a right in the grantor, if the grantees did not furnish marble from them, to enter and keep possession and take the marble himself, till the grantees should be ready and willing to fulfil the conditions of the contract on their part, an injunction which, after unwarrantable and illegal entry for alleged condition broken, enjoined the grantor from hindering the grantees from retaking possession and occupying and using the premises *until the further order of the court,* was held too broad, and on appeal was modified so as only to enjoin against an entry for any cause *theretofore* existing; thus leaving the grantor to enjoy his reserved right *thereafter* untramelled.

4. Where a corporation, by its own voluntary act, has bought lands charged by covenants inseparable from the deed by which the land was originally conveyed, and which were part of the consideration of the grant, a court of equity cannot strike out a part of the covenants, because though originally intended to operate for the equal benefit of both parties, they have become in progress of time oppressive and burdensome to the grantee; or because the purchase would make the corporation partners with the grantor in working the land, whether they would or not, contrary to their duties as a corporation, and the contract would thus become one restraining the alienability of property.

5. Specific performance of a contract will not be decreed:

(*a*) Against one party in favor of another who has disregarded his own reciprocal obligations in the matter; as *ex. gr.,* against a grantee of land charged with certain duties in regard to it, in favor of a grantor who has made a re-entry both unlawful and fraudulent.

(*b*) Nor where the duties to be fulfilled by the grantee are continuous and involve the exercise of skill, personal labor, and cultivated judgment; as *ex. gr.,* to deliver marble of certain kinds, and in blocks of a kind that the court is incapable of determining whether they accord with the contract or no:

(*c*) Nor where there is a want of mutuality in the contract; as *ex. gr.,* where it is stipulated that one of the parties may abandon the contract at any time on giving a year's notice:

(*d*) Nor where the party (a grantor) has a complete remedy at law; as *ex. gr.,* in a grant of quarry land, the grantee agreeing to quarry and deliver to the grantor certain sorts of marble from it, and the grantor reserving a right of re-entry in case of non-performance, in order to supply himself, and having moreover a remedy by an ordinary suit at law on the contract.

6. A restriction upon absolute ownership in a grant of land having on it a quarry, where the grantees agree to deliver to the grantor, his heirs, &c., so long as they might want, a certain number of feet, per annum, of stone of certain kinds, for a partnership purpose (the grantor reserving a right of re-entry and of taking the stone himself, if the

grantees do not fulfil their agreement) is not to be raised by implication. Hence, in the case of such a grant, where there is no obvious restriction upon the quantity of stone which the grantees may take out, it cannot be inferred that the grantees were meant to be limited to taking out no more stone than that which they have agreed to deliver to the grantor.

7. Such a grant and reservation as that described in paragraph No. 3, *supra*, limited however in the extent to which the grantees were bound to furnish marble, does not leave in the grantor a corporeal interest in the marble "*in situ*," and hence his interest is not exclusive of the right of the grantees to take marble on their own account "*ad libitum.*"

THESE were appeals from the Circuit Court for the District of Vermont, in two decrees, one of them on a bill filed by the Rutland Marble Company against a certain Ripley and one Barnes, and the other one a cross-bill filed by the same Ripley against the company just named. The case was this:

On the 22d of January, 1850, the said Ripley and the said Barnes together owned a tract of land in Rutland township, Vermont, containing about twenty-one acres, in which was a valuable marble quarry. On that day Ripley, by his deed, released and quit-claimed unto his co-tenant, Barnes, in fee simple, the tract of land. The deed contained a reservation to the releasor, his heirs, executors, administrators, and assigns, of "the right to enter upon and take possession of the said twenty-one acres, for the purpose of digging, quarrying, and carrying away all the marble he or they might want, according to the stipulations and conditions of a contract that day made and concluded between the said Ripley and Barnes, in case the said Barnes, his heirs, executors, administrators, and assigns, should refuse, or fail on their part to fulfil the conditions and stipulations of the said contract." By the contract referred to, which was made on the same day, Barnes agreed, "for himself, his heirs, executors, administrators, and assigns, to quarry marble from the marble quarry, and draw and deliver at the mill of the said Ripley, in Rutland, from the *layers of marble usually denominated the white layers* in said quarry, all the marble that the said Ripley

might want to saw, manufacture, and sell, in good sound blocks, of suitable size, shape, and proportion, and to quarry to order as might be wanted to keep the mill *fully supplied at all times,* the amount to be not less than 75,000 feet per annum, and for so long a time as the said Ripley, his heirs, executors, administrators, and assigns might want." It was also agreed that should Ripley, his heirs, &c., at any future time desire to increase the business, Barnes, his heirs, executors, administrators, and assigns, should furnish the blocks, as aforesaid, to the extent of 150,000 feet per annum of two-inch marble slabs, on receiving one year's notice to that effect. It was also agreed that Ripley, his heirs, &c., or his or their agents, might have the privilege of dividing each lot of blocks, as taken and drawn from the quarry, taking an average share as to quality, size, and shape, before any blocks should be taken from the lots by any other person, the first choice always being taken by Ripley, or for his mill. It was also stipulated that Ripley *might abandon the contract at any time on giving one year's notice.* The contract further stipulated that if Barnes, his heirs, executors, administrators, or assigns should fail or refuse to fulfil its conditions, Ripley, his heirs, executors, administrators, or assigns, or his or their agents, *might enter upon the quarry and the premises attached to, and connected with it, and might quarry and dig, take and carry away, as much marble as they might want;* and might have the use of, and enjoy all the rights, privileges, and appurtenances belonging to, or connected with, the said quarry, without hindrance or obstruction, or in any way paying for the same, and might keep possession *until Barnes, his heirs, executors, administrators, or assigns, should be ready and willing to fulfil the conditions of the contract on their part;* it being also provided that if, after making an entry as aforesaid, Ripley, or his heirs, &c., should make an opening, or put the quarry in a better condition for getting out marble, Barnes, his heirs, executors, administrators, or assigns should not re-enter, or resume possession, until Ripley, his heirs, &c., should have had the benefit of the work done and money expended by them, unless

Barnes should make payment for the same. It was further provided that Ripley, his heirs, executors, administrators, and assigns should receive the marble blocks so delivered at the mill; should saw, trim, and prepare them for market; should sell them, advancing from time to time to Barnes, *as the blocks should be delivered,* twelve cents per foot of two-inch marble, as payment for drawing and quarrying, and retaining from the proceeds of sales of the marble an equal sum per foot, as payment for sawing and trimming, retaining also from the proceeds of sales the expenses of transportation to market, and all the necessary expenses of doing the business and collecting payment for the marble (not including payment for his own time and labor), and should divide the remainder of the proceeds of sale equally between Barnes and himself, as collected. Ripley further agreed to pay Barnes one cent per foot of two-inch marble for drawing and transporting the marble from the quarry to the mill, the payment to be made from his own funds. At the date of this contract the quarry had been opened at the north end only, though Barnes contemplated making an opening on the south end, for two persons named Allen and Adams. The contract contained accordingly still another provision, evidently an alternative; to wit, that if the marble contained in that part of the ledge which Barnes was about to open for Allen and Adams should prove to be of better quality than the marble from the quarry then opened and worked upon the land, Barnes should open on the south end of the lot conveyed to him, and furnish Ripley with marble from that place on receiving reasonable notice.

Barnes having thus become the owner in severalty of the land containing the quarry, conveyed it, on the 1st of June, 1854, to sundry persons, expressly excepting the right reserved by Ripley in his deed aforesaid, and reserving to himself a right of entry in case his grantees should fail to perform his contract with Ripley. By several mesne conveyances the property became vested in the Rutland Marble Company on the 31st of October, 1863. In all the deeds, including that to the company, the right of entry reserved

by Ripley in his conveyance to Barnes, and his rights under the contract, were expressly excepted, and the grantors reserved also a right of entry on the failure of their grantees to comply with the engagements of the contract of January 22d, 1850.

Soon after the contract was made, Ripley gave notice that he required his supply of marble under it to be increased from 75,000 to 150,000 feet, and on the 24th of July, 1854, he gave notice that he wanted the whole of his marble quarried from the south end of the ledge, next to the opening of Allen and Adams, according to the contract. On the 22d of August, 1855, he again gave notice that he claimed, under his contract of January 22d, 1850, to be *forever* thereafter supplied with marble from a proper opening of the ledge for the purpose, on the south end of the lot conveyed by his deed to Barnes. Accordingly an opening was made at the south end, necessarily at considerable expense, and he was supplied therefrom for years, until the spring of 1864, and until differences arose which resulted in these suits. Until that opening was made in 1854, or 1855, there was none on the land except the one which had been made at the north end before the contract between Barnes and Ripley was signed.

In the year 1854, while Barnes was still the owner of the land, a modification of the contract was agreed upon between him and Ripley, the particulars of which it is not necessary here to notice. The modification expired by its own limitation on the 1st of February, 1864, leaving the original agreement in full force. As already said, the marble company had, prior to that time, become the owners of the property; and they had fulfilled, so far as it appeared, the requirements of the modified contract. But very soon after its expiration, if not before, differences arose between them and Ripley respecting their rights under the agreement. On the 15th of February, 1864, he gave them notice that he claimed a right to divide every lot of blocks at all times thereafter, when taken from the quarry, insisting on a right to a first choice; and when this demand was resisted by the

marble company it was renewed by Ripley. Differences also arose between the parties respecting Ripley's obligation under the terms of the contract, calling for " layers of marble usually denominated the white layers," to receive certain kinds of marble called brocadilla, having in a basis essentially white considerable deposits of blue or green ; differences also respecting his right to demand payment for unloading at his mill, and respecting his obligation to pay for quarrying and hauling.

In this state of things, on the 5th of April, or within a day or two after it, a strike took place among the workmen at the quarries.   On its occurring Ripley advised the company to hold out, saying " that he would aid in whatever way he could; that the workmen had had their way long enough; that the company ought to resist the thing *now*, and ought to have done it years before."   When replied to by the agent of the company that the difficulty to resistance was in the contract with him about the mill, he said " that the strikes affected his men and all the men at the mills, and that he would rather wait six months, or even twelve, and have the company get possession of the quarry and manage it as it ought to be managed."   Evidence, however, showed that it was observed about the 13th or 16th of April, that Ripley himself was having drills made of the sort used in quarrying, and that he kept persons in ignorance of the purpose for which he meant to use them, and that when told by an agent of the company whom he had advised to hold out against the strike, " that the men understood that *he* was going to set them to work, and that he was thus helping the strike along as much as any one;" his reply was " that they did not know but that he was going to quarry somewhere else; that they did not know where he was making drills to be used." Whether the company had furnished to Ripley all the marble that he had a right to demand, under the contract of January 22d, 1850, was one of the matters in controversy.   His mills had been enlarged after the date of that contract, so that they could saw 300,000 feet; and *so enlarged*, were perhaps not fully supplied at all times.   It appeared, however,

by the testimony of Ripley himself, and by his cross-bill, that between the 1st of February, 1864, when the already-mentioned modification of the contract expired, and the 3d of April (about which time the strike began), the marble company had delivered at Ripley's mill about 26,687 feet of marble. Ripley, it appeared, was in arrears at this time with his payments; and quarrying in the winter, it was proved, is a sort of work which in a latitude so high as that of Vermont, where frost necessarily pervades a quarry, is performed with injury to the quarry worked on.

On the 26th of April, soon after the strike was complete, Ripley, without giving any notice of his intended action, caused an entry to be made upon the entire property, as well the southern opening as the northern. The entry was made about three o'clock in the morning, by Barnes, acting for Ripley, and a large number of men were set at work, to the exclusion of the marble company.

The company hereupon filed a bill in the court below, setting forth various alleged pretensions of Ripley, which it said were unfounded; the strike and his complicity with the workmen; that his mill was always sufficiently supplied, &c.; and praying

That Barnes and Ripley might be enjoined against further unlawful interference with, or occupation of the then, the complainants' said property:

That the contract might be decreed rescinded and terminated, or, if not, that various questions respecting its construction might be settled by the decree of the court, and that the defendant, Ripley, might be required to account for the money of the complainants in his hands.

To this bill answers were put in by the defendants, and a cross-bill was filed by Ripley. The answer of Ripley, more material than Barnes's, after a general history of things, denied most of the important allegations of the bill. It admitted, however, the strike, as stated in it, and after saying that he had expressed the opinion that the company should at once have refused all further employment of the laborers when the men struck, and have employed a new set of men,

which he believed might have been done long before April 26th (the date of his entry), he proceeded to answer that the company totally disregarded his said opinions, and wholly neglected, so far as he could learn, to make any arrangement to substitute new laborers or to renew the business of quarrying, and being reliably informed and believing that no arrangement *would ever be made with the laborers for their return to work, and the use and possession of the quarries having been to all appearance entirely vacated from the time of the strike (which was April 5th or 6th), he entered.*

The cross-bill, after setting forth the same sort of a general history, and an account of the disputes that had arisen, &c., went on to represent that the marble company were working the quarries to an enormous excess over and above the quantity authorized or required by the contract of 1850, or any reasonable or proper expectation of the parties under the same, and were supplying other parties, and the trade in general, with great quantities of marble taken from the quarries, in violation of the rights of Ripley; that the whole mass and quantity of marble of the kind and description mentioned in the contract contained on the land, was limited and not inexhaustible, and that a continuance by the company in their then present rate of exhaustion and supply of the general market therefrom, would in a short time so exhaust the quarry as to render the performance of the contract of 1850 impossible, whereby he, the defendant, Ripley, would be entirely deprived of his beneficial interest in the quarry arising under the contract, and the whole profit and advantages thereof would be absorbed and exhausted by the company. The cross-bill prayed accordingly that the company might be decreed to perform specifically the contract by furnishing the marble as therein required, or deliver up the possession of the quarry and property to the said cross-complainant, free and discharged from all claim, right, or title which the said company ever had, or then had, in and to the same; and that in the meantime they be restrained from operating or working the quarry, or selling any marble taken therefrom; that they be decreed to pay such damages

as the complainant might have sustained in consequence of their not having supplied his mill with marble as required by the contracts of 1850 and 1854, and pay the same by a specified day, and that the quarry be held as security therefor, and in default of such payment the company should be foreclosed of all equity of redemption or claim in and to said quarry and property.

The answer to the cross-bill, denying many other allegations, denied upon belief, that the quarry was likely to be exhausted, at least within a century, by any amount of work within the power of the company to give, or justified by their interests, and it insisted that the contract did not secure to Ripley the exclusive product of the quarry, but that the company had a right to work it for their own benefit independently of the arrangement; and admitting that they were taking from the quarry, and were disposing of more marble than was required to supply Ripley under the contract.

The grounds upon which the marble company rested their prayer that the contract might be rescinded and cancelled were, that Ripley had not performed the duties which it imposed upon him; that though it was, when made, intended to operate for the equal benefit of both parties, it had become, in the lapse of time, with the increased demand for marble, the greatly enhanced cost of production, and the entire change in the character and results of the marble business, grossly unfair and unequal; so much so, indeed, that the defendant's net receipts under it had become more than twelve times as much as those of the complainants; to *him*, yielding a yearly revenue of $40,000; to *them*, resulting in a very great loss on the marble supplied, and a return barely sufficient to defray the expenses of executing the contract; an inequality which they alleged was not denied, and was plainly unconscionable; that in addition to this, the contract made the company partners with Ripley, or his successors, in title to the mill, whether they would or not; and that, if corporations could not enter into partnership, they could not purchase the lands subject to the obligation of

becoming partners, and therefore that the contract restrained the alienability of the property.

One of the grounds on which Ripley rested his claim to a decree for specific performance of the contract was a notice from the marble company, given to him on the 18th of June, 1864, that they would maintain that the facts set forth in their bill amounted *to a permanent breach and violation on his part of the contract, authorizing them to treat it as rescinded, and that they therefore rescinded it,* asserting that they had always performed it on their part until it was thus violated and broken by him.

The Circuit Court, after a hearing, granted an injunction in accordance with the prayer of the Rutland Marble Company, restraining the defendants, Ripley and Barnes, from the further occupation or possession of the premises and property described in the bill, and from any interference therewith, and enjoining them against hindering or disturbing the complainants from taking possession of, occupying, and using the same *until the further order of the court.* But the court refused to decree a rescission and cancellation of the contract itself.

The court also, in effect, decreed a specific performance of the contract, as prayed in the cross-bill, and made several decretal orders respecting the manner in which the contract should be performed, but the injunction asked for in the cross-bill was denied.

Among the decretal orders was one, that Ripley should pay over *monthly* to the company its share of the money received by him from the marble business; and there was none, as he by this cross-bill had prayed for, that the court would enjoin the company from selling and disposing of marble taken from the quarry. From the decrees above mentioned, and the decretal orders, appeals were taken to this court; Ripley, in *his* appeal, specifying as a second ground for it, the manner in which, as above stated, he was required to account with the company; and as a sixth ground,

" The omission and refusal of the court to enjoin the company from selling or disposing of marble taken from the quarry."

The matters considered by the court, accordingly, were:

I. *Upon the bill by the marble company.*

1. Whether the case was one for the injunction prayed for by the company against Ripley and Barnes.

2. Whether the case was one for the cancellation of the contract of January 22d, 1850.

II. *Upon the cross-bill by Ripley.*

1. Whether, it being decided that the contract was not to be cancelled, Ripley was entitled to a decree for specific performance of it by the company.

2. Whether the decretal orders above quoted and objected to by Ripley were erroneous.

The case, of which the transcript filled 904 printed pages, was elaborately argued by *Messrs. B. R. Curtis and E. J. Phelps, for the Rutland Marble Company; and by Messrs. George F. Edmunds and W. M. Evarts, contra.*

Mr. Justice STRONG, having stated the case, delivered the opinion of the court.

The first question presented for our consideration is whether the pleadings and proofs exhibited a proper case for an injunction upon the defendants, Ripley and Barnes, against disturbing the complainants in their right to take possession, occupy, and use the property entered upon by the said defendants, and against continuing the occupation which they had commenced of the quarries and other property, real and personal, of the company. The solution of this depends upon another question, which is, whether the entry made by Ripley, through his agent, Barnes, on the 26th day of April, 1864, was lawful under the circumstances in which it was made.

It is to be observed that the contract of January 22, 1850, between Ripley and Barnes, was in a very practical sense a contract of partnership, and that to Barnes's position under

it the complainants have succeeded. By its terms each of the parties was bound to contribute to a common enterprise. Each had his own duties to perform. Barnes was to furnish the marble needed for the mill, and Ripley was to bestow his own labor and care in manufacturing it for the market and selling it. When this had been accomplished the net proceeds of sale were to be equally divided. Neither of the parties had a right to interfere with the specified duties of the other so long as that other discharged his obligations under the contract. But they had a common interest in the business carried on, quite as truly as if theirs had been an ordinary partnership. Any unauthorized attempt by one to oust the other from the position and rights assigned to him by the contract was, therefore, not only a breach of their agreement, but a fraud upon the relation they had assumed to each other. Such a wrong it is the province of a court of equity to prevent. A chancellor will interfere by injunction to restrain one partner from violating the rights of his copartner, even when a dissolution of the partnership is not necessarily contemplated.*

*Primâ facie,* the entry of Ripley upon the quarry property and the consequent deforcement of the complainants was an invasion of their rights as owners of the land, and as jointly interested with him in the marble business. The burden is upon him, therefore, to show that his entry was justifiable. Has he shown it? Under the reservation in Ripley's deed, and under the contemporaneous agreement, his right to enter existed only in case Barnes, or his successors in the title, should fail or refuse to fulfil the conditions and stipulations of the contract; that is, should fail or refuse to deliver the marble as required by it. A right to enter for any other cause is not claimed. After a careful examination of the evidence we do not find that there had been any such failure on the part of the complainants to deliver marble prior to April 26, 1864, as justified Ripley in entering upon their possession. They were not bound to keep in full supply

---

* Story's Equity, § 669.

the mill which he then had.   The contract had reference to
a supply of the mill as it was in 1850, when its capacity was
less than 150,000 feet per annum.   And when, afterwards,
he enlarged his mill so that he could saw 300,000 feet,
nothing in the contract required Barnes, or his alienees, to
keep the enlarged mill supplied.   The obligation was only
to furnish 150,000 feet per annum, as it might be wanted to
supply the old mill.   Nor did the contract require that any
defined portion of the whole quantity should be delivered at
any specified season of the year.   Undoubtedly its spirit
demanded that the deliveries should be reasonable.   But it
is in evidence that quarrying marble must be principally in
moderate or warm weather, when there is no frost.   It is,
therefore, a reasonable construction that the parties intended
the deliveries should be greatest in the summer and fall.
Yet the evidence is, that the complainants delivered at his
mill, during the months of February, March, and April of
1864, more than 26,000 feet, besides other blocks which he
refused to receive.   In fact a considerably greater quantity
was delivered.   All this was between February 1st (when
the modification of the contract before mentioned expired)
and the 3d of April.   This was in excess of a ratable propor-
tion of what the company was bound to quarry and deliver.
After the 2d of April there was an interruption of deliveries,
caused by a general turn-out of the workmen at the quarries,
of which we shall have more to say hereafter.   But what is
most significant and convincing that there was no failure on
the part of the company is Ripley's own sworn answer to
their bill.   It appears from what he himself states in this an-
swer, that the reason for his entry was, not that there had
been any failure or refusal to supply his mill with marble,
so far as he had a right to claim it, but that the marble com-
pany disregarded his opinions, and he was apprehensive
they would not be able to induce the laborers to return to
work.   It is plain that for such reasons neither the reser-
vation in his deed nor the provisions of the contract gave
him any right of entry.   His intrusion upon the complain-
ants' possession was, therefore, entirely unjustifiable, and a

wrong the continuance of which a court of equity may well restrain.

We are also of opinion that his entry was not made *in good faith*, merely to supply himself with marble. Very soon after the modified contract came to an end he set up claims, some of which, at least, had no foundation in the contract. On the 15th of February he gave notice that he claimed a right to divide every lot of blocks, at all times thereafter, when taken from the quarry referred to in his deed and in the contract, insisting upon a right to the first choice; and this, though he had elected forever to take all his marble from the south opening, which he had required to be made under the alternative provision of the contract. This was either claiming inconsistently with his demand for all his marble from that opening, or it was, in effect, requiring the company to take therefrom twice as much as was necessary to supply the 150,000 feet for his mill. When the demand was resisted it was renewed, though without right. Differences of opinion also arose between the parties respecting Ripley's obligation to receive particular kinds of marble, respecting his right to demand payment for unloading it at his mill, and respecting his obligations to pay for quarrying and hauling. We do not enter now upon any consideration of the inquiry which of the parties was right. It is sufficient to notice that there were differences. It was while they existed, early in April, the strike of the laborers occurred. The evidence establishes beyond any reasonable doubt that Ripley advised the agents of the company to hold out against the strike, and that when told the mill contracts made a difficulty, he said he would rather go without marble six months, or a year, than that the company should submit to the strikers. Yet at this time when giving this advice and making these professions, he was preparing secretly to make an entry on the property. He was having drills made at least a week or ten days before he made his entry at night, concealing the purpose for which they were made, and his design to enter. When told that he was aiding the strike, as the men understood he was intending to set them at work,

he replied the men did not know but that he was going to quarry somewhere else. Meanwhile he was himself refusing, or at least neglecting to pay what he was bound to pay, at the time when it was due. It is impossible to read the evidence without being convinced that he intended to secure the possession of the property by surprising the complainants, and thereby force them to assent to his demands and his interpretation of the contract. Such being the conclusions to be drawn from the evidence, we cannot doubt that the injunction decreed by the Circuit Court was correctly awarded.

It was, however, too broad. It restrained the defendants, Ripley and Barnes, not only from the further occupation or possession of the premises and property described in the bill, and from any interference therewith, but it enjoined them against hindering or disturbing the complainants from taking possession of, occupying and using the same, *until the further order of the court.* The effect of this is to deny to Ripley the right of entry reserved in his deed, and forbid his exercising it, though the complainants should hereafter wholly refuse to deliver any marble, unless the court by a future order shall allow an entry. This is probably more than was intended. The decree should be modified so as only to enjoin against an entry for any cause heretofore existing, leaving Ripley to enjoy his reserved right hereafter entirely untrammelled.

We proceed next to inquire whether there is any sufficient reason for decreeing a cancellation of the contract of January 22, 1850, as prayed for by the marble company. This is a call for an exercise of the highest chancery power, a power most frequently exerted in cases of fraud, accident, or mistake. The grounds upon which the company rest their claim that the contract may be decreed to be rescinded and cancelled are, that Ripley has not performed the duties which it imposed upon him; that though it was, when made, intended to operate for the equal benefit of both parties, it has become, in the progress of time, oppressive and burden-

some to the complainants, or, as they denominate it, uncon-scionable; that it makes them partners with Ripley, or his successors in title to the mill, whether they will or not; and that, if corporations cannot enter into partnership, they can-not purchase the lands subject to the obligation of becoming partners, and therefore the contract restrains the alienability of the property.

Before proceeding to a consideration of these it is proper to remark that the agreement is inseparable from the deed for the land made by Ripley to Barnes. They were made at the same time, and they are parts of one arrangement. What is asked, therefore, is, not to rescind an entire con-tract, but to strike out of it a part which has become onerous to one of the parties. It is clear that the rights secured to Ripley by the agreement were a part of the consideration for his grant of the land, and so it was understood at the time his deed was made. If there were nothing else to show this, it is made apparent by the reservation in the deed of a right of entry to secure the fulfilment of the stipu-lations of the agreement. But the deed was an executed contract. It conveyed the title to the grantee. If, there-fore, the agreement is rescinded by a decree of the court, the consideration of the grant is taken from the vendor after his conveyance has taken effect, and yet his grant is en-forced. It is believed that such action by a court of equity is quite unprecedented. It has been ruled that when a party seeking to set aside a conveyance made by him has received part of the consideration, he must return it before a court of equity will cancel the conveyance.* That one party to an executory contract, partly executed, has violated his en-gagements, is generally no sufficient reason for a decree by a court of equity, at the suit of the other party, that the con-tract shall be annulled. Certainly it is not in the present case. If the contract has been broken by Ripley, the marble company has an adequate remedy at law. Nor is it any reason for rescinding the contract that it has become more

---

* Miller *v.* Cotten, 5 Georgia, 341; Story's Equity, § 707.

burdensome in its operation upon the complainants than was anticipated. If it be, indeed, unequal now, if it has become unconscionable, that might possibly be a reason why a court should refuse to decree its specific performance; but it has nothing to do with the question whether it should be ordered to be cancelled. It is not the province of a court of equity to undo a bargain because it is hard. Nor have the other reasons assigned in support of the complainants' prayer for cancellation any more weight in view of the circumstances of the case. The marble company have, by their own voluntary act, placed themselves in the position they occupy. With a full knowledge of the reservation in Ripley's deed to Barnes, and of the contract, the performance of which the reservation was intended to secure, they purchased the quarries. They purchased expressly subject to the rights guaranteed to Ripley, and they undertook with their grantors to perform the promises Barnes had made, so long as they held the land. At the time when they purchased, the contract had been in operation for years, and they knew its effect. It is fair to presume that the burden of the contract was considered in fixing the price they paid. They are, therefore, not in a condition to ask for its rescission, and the Circuit Court rightly refused to decree a cancellation.

The next question is, whether Ripley, the defendant, was entitled, upon his cross-bill, to a decree against the marble company for a specific performance of the contract. The court below substantially directed such performance, and from that decree the marble company have appealed, and they now urge that the contract, though supposed to be fair and equal when made, has, in the lapse of time, and by the operation of unforeseen causes, arising from changed circumstances, become exceedingly unfair, unreasonable, and unconscionable, so that a decree for its specific performance would tend to their oppression and ruin. It may be doubted, however, whether the hardship of the contract is any greater than must have been contemplated when it was made. It is

not unconscionable because Ripley obtains a larger profit from it than was at first expected, or because the other party obtains less. Those were contingencies, the possibility of which might have been foreseen. It could not have escaped the thought of the contracting parties that the expense of quarrying might possibly increase, and that the expense of sawing and preparing for market might either increase or diminish in the progress of time. Of that they took their chances. Besides, it is by no means clear that a court of equity will refuse to decree the specific performance of a contract, fair when it was made, but which has become a hard one by the force of subsequent circumstances or changing events. Mr. Fry, in his work on Specific Performance,* asserts that "the question of the hardship of a contract is generally to be judged of at the time at which it is entered into; that if it be then fair and just, it will be immaterial that it may, by the force of subsequent circumstances or change of events, have become less beneficial to one party, except when these subsequent events have been in some way due to the party who seeks the performance of the contract." Judge Story, indeed,† states the rule somewhat differently, and there are some cases that support his statement; but the rule as stated by Mr. Fry must be applicable to contracts that do not look to completed performance within a defined or reasonable time, but contemplate a continuous performance, extending through an indefinite number of years, or perpetually.

There are other objections, however, to a decree for a specific performance in this case which are more serious. Such a decree is not a matter of right. It rests in the sound discretion of the court, and generally it will not be made in favor of a party who has himself been in default. In Story's Equitable Jurisprudence,‡ it is said that "in cases of covenants and other contracts, where a specific performance is sought, it is often material to consider how far the reciprocal

---

\* Page 116, and see entire chapter 6.
† Equity Jurisprudence, §§ 750 and 776.          ‡ § 736.

obligations of the party seeking the relief have been fairly and fully performed. For, if the latter have been disregarded, or they are incapable of being substantially performed on the part of the party so seeking relief, or from their nature they have ceased to have any just application by subsequent events, or it is against public policy to enforce them, courts of equity will not interfere." To the same effect are Smith's Principles of Equity;[*] *Thompson* v. *Tod*,[†] *Lewis* v. *Wood*,[‡] and many other cases. Applying these principles to the case in hand, it would appear that the conduct of the cross-complainant has not been such as to justify the court in decreeing a specific performance, at his suit, against the marble company. Without relying upon his alleged unfounded claims set up from time to time, or his alleged refusals or failures to make the payments due from him at the times required by the contract, or his alleged comfort given to the turn-out of the workmen, and his advice that the company should resist it, his unlawful and unwarranted entry and ouster of the marble company was such an invasion of the contract as leaves him no standing as a complainant asking for its performance in a court of equity.

Another serious objection to a decree for a specific performance is found in the peculiar character of the contract itself, and in the duties which it requires of the owners of the quarries. These duties are continuous. They involve skill, personal labor, and cultivated judgment. It is, in effect, a personal contract to deliver marble of certain kinds, and in blocks of a kind, that the court is incapable of determining whether they accord with the contract or not. The agreement being for a perpetual supply of marble, no decree the court can make will end the controversy. If performance be decreed, the case must remain in court forever, and the court to the end of time may be called upon to determine, not only whether the prescribed quantity of marble has been

---

* Page 220.                    † Peters, Circuit Court, 380.
‡ 4 Howard's Mississippi, 86.

delivered, but whether every block was from the right place, whether it was *sound*, whether it was of *suitable size*, or *shape*, or *proportion*. Meanwhile the parties may be constantly changing. The marble company are liable so long as they hold the land, and Ripley's rights exist only while he holds the mill. It is manifest that the court cannot superintend the execution of such a decree. It is quite impracticable. And it is certain that equity will not interfere to enforce part of a contract, unless that part is clearly severable from the remainder.* Many of the difficulties in the way of decreeing specific performance of a contract, requiring, as this does, continuous personal action, and running through an indefinite period of time, are well stated in *The Port Clinton Railroad Company* v. *The Cleveland and Toledo Railroad Company.*†

Another reason why specific performance should not be decreed in this case is found in the want of mutuality. Such performance by Ripley could not be decreed or enforced at the suit of the marble company, for the contract expressly stipulates that he may relinquish the business and abandon the contract at any time on giving one year's notice. And it is a general principle that when, from personal incapacity, the nature of the contract, or any other cause, a contract is incapable of being enforced against one party, that party is equally incapable of enforcing it specifically against the other, though its execution in the latter way might in itself be free from the difficulty attending its execution in the former.‡

But what is a still more satisfactory reason for withholding a decree for specific performance is, that the party who asks for it has an entirely adequate remedy provided by the reservation in his deed, and by the contract itself. In addition to his remedy by suit at law, he has a right of entry and the privilege of supplying himself with marble, as much as he may want, if the owners of the land do not fulfil the

---

* Ogden *v.* Fossick, 9 Jurist, N. S. 238.    † 13 Ohio, 544.

‡ Fry on Specific Performance, ? 286.

conditions and stipulations of the contract. He may take marble without making payment for it, and in case of such entry he may hold possession until the tenants of the fee are ready and willing to carry out the agreement, and until he has been compensated for all his expenditure. This is a remedy more adequate and full than any decree for specific performance could give him, and it renders such interference of a court of equity entirely unnecessary.

For these reasons we are of opinion that the Circuit Court should not have decreed performance in specie of the contract, but should have left the cross-complainant to his action at law, or to the remedy reserved in his deed.

It is true that the marble company, on the 18th of June, 1864, gave notice to Ripley that they would claim that the facts set forth in their bill amounted to a permanent breach and violation on his part of the contract, authorizing them to treat it as rescinded, and that they therefore rescinded it, asserting that they had always performed it on their part until it was thus violated and broken by him. But this was after his wrongful entry, which certainly relieved them for a time from delivering marble, and the notice in no way interferes with any remedy he may have at law, or with any right he has to enter under the reservation in his deed.

The decree, so far as it orders specific performance, will therefore be reversed, as also all the decretal orders that direct the mode of performance.

We have thus disposed of all the questions raised by the appeal of the complainants, The Rutland Marble Company, and of most of those raised by the appeal of the defendant, Ripley. Two or three questions remain to be considered. It is sufficient to say, in answer to the second specification of his appeal, that we do not perceive that he was required to pay the company's share of the money received by him from the marble business any more rapidly than the contract, giving to it a reasonable construction, demanded.

In the sixth specification it is averred that the decree is

erroneous, in that it omits to order and direct that The Rutland Marble Company, their agents, servants, and assigns, be enjoined from selling or disposing of marble taken from said quarry of said company.   Though the appeal is in these broad terms, it is presumed the appellant does not mean to be understood as claiming that the marble company should be enjoined against selling as much marble as the quantity furnished by them for the mill.   If this is not so, then the construction he would have given to the contract is that the tenants of the fee must quarry every year 300,000 feet, and deliver one-half thereof at the mill, leaving the remainder unsold and undisposed of.   This is a construction so unreasonable and so at variance with the words of the contract, that it needs only mention to show its inadmissibility.   Assuming, then, it to be meant that the court should have enjoined against a sale of marble from the land greater in quantity than that which was required by the contract to be delivered at the mill, we are of opinion the claim cannot be maintained.   It has been argued in support of it that the evidence shows the quarry to be exhaustible within a definite number of years; that the contract contemplated a perpetual supply for the mill, or a supply so long as the marble shall last, while the quarry shall be worked in the manner contemplated and prescribed by it; and hence that taking out marble and disposing of it in greater quantities than the mill requires, with a right of choice of blocks in Ripley, is an invasion of his right.

The argument is faulty in several particulars.   It assumes that the contract prescribed a mode of use of the quarries exclusive of any other.   Such is not the agreement.   It bears upon its face the evidence that supplies of marble to other consumers than Ripley's mill was contemplated.   There certainly is no express restriction of the quantity which the owners of the land may take out, and restriction upon the absolute rights of ownership in fee is not to be raised by mere implication.   When Ripley required, under the last provision of the agreement, all his marble to be furnished from the south opening on the lot, and when, in obedience

to his demand, the opening was made by Barnes, it should require unambiguous language to satisfy a court that Barnes and his successors in the title were excluded from taking marble from any other opening for the purpose of sale.

The argument also misapprehends the nature of such a right as Ripley's, even though it be conceded that it was intended to provide for a perpetual enjoyment of a marble supply. Neither the contract nor the reservation in his deed gave him a corporeal interest in the marble *in situ*. It was not a grant to him of the marble, or a grant of a right to quarry and take it all. If his interest was real in any sense, which may be doubted, it was incorporeal. Of course it was not exclusive of the right of the owners of the land to take marble on their own account *ad libitum*. In Lord Mountjoy's case, reported by Godbolt,* by Leonard,† in Coke Littleton,‡ by Moore,§ and more fully by Anderson,|| a leading case, the words of the reservation were:

"Provided always, and it is covenanted, granted, concluded and agreed between the said parties to this indenture, and the said John Brown and Charles (the grantees), *and their heirs* covenant and grant to and with the said Lord Mountjoy, his *heirs and assigns*, by these presents, in form following, that is to say, that it shall be lawful for the said Lord Mountjoy, *his heirs and assigns*, at all times hereafter, to have, take, and dig in and upon the heath ground of the premises, from time to time, sufficient ores, heath, turves, and other necessaries for the making of alum and copperas."

Here was a reservation from grantees and their heirs to a grantor, his heirs and assigns, quite as large as in the present case. Yet it was held an incorporeal hereditament, and not a grant of an exclusive right. It was likened to a grant of common *sans nombre*, leaving the grantors a right to dig and take ore, though their so doing might exhaust it. *Chetham* v. *Williamson,*¶ is another case equally decisive to the same effect. Other decisions asserting the same doctrine

---

* Case 24.          † 4 Leonard, 147.          ‡ Page 104.
§ Page 174.          || Page 307.          ¶ 4 East, 469.

are at hand: *Caldwell* v. *Fulton*,* *Johnston Iron Company* v. *The Cambria Iron Company*,† *Gloninger* v. *The Franklin Coal Company*.‡   In all of them the covenants ran with the land. The grants were of undoubted real interests. They contemplated a perpetual supply to the grantees as plainly as it was contemplated in this case. The rights of the grantees were not limited, as here, to any defined quantity, and yet it was held they did not interfere with the right of the grantors to take ore, coal, &c., from the property out of which the incorporeal interests issued, and to take it without stint. The appeal of the cross-complainant cannot therefore be sustained.

Nor, under the circumstances of the case, can the marble company be decreed to account for failures to supply the marble required by the contract to be delivered at the mill, if there have been such failures. Holding as we do, that there can be no decree for a specific performance, and that Ripley is not entitled to an injunction against selling marble from the quarry, the substantial basis of the defendant's cross-bill fails, and having disturbed the plaintiffs' possession wrongfully, and thereby interfered with their power to perform the contract, he is not in a situation to invoke equitable aid. If he has any claim to damages for a breach of the contract, it must be asserted at law, and there his remedy is complete.

It remains only to add, what must now be apparent, that that part of the decree which directed Ripley to pay the taxable costs, except such as accrued from the portion of the complainants' bill which sought to annul the contract, was correct.

DECREE REVERSED, and the cause remitted with directions to enter a decree in accordance with the opinion above given. The costs of the appeals to be divided, and one-half be paid by each of the parties.

---

* 31 Pennsylvania State, 482.    † 8 Id. 241.    ‡ 55 Id. 9.