(84 South. 104)

No. 22484.

SNYDER v. WILDER.

(June 2, 1919. On Rehearing, March 1, 1920.)

*(Syllabus by Editorial Staff.)*

1. SPECIFIC PERFORMANCE ⟨⟩29(1)—CONTRACT TO ASSIGN RECORDED LEASES SUFFICIENT THOUGH MERELY IDENTIFYING THEM BY REFERENCE.

In a suit for specific performance of a contract to assign oil leases, where the leases were all of record, and for identifying them as between the parties a mere reference to them was sufficient, the fact that they were merely described in the contract with reference to a map did not render the contract so indefinite that performance could not be decreed.

2. LIS PENDENS ⟨⟩13—WHERE DESCRIPTION IN CONTRACT INSUFFICIENT AND NOTICE NOT FILED, TRANSFEREE TOOK FREE FROM CLAIMS.

Where description of oil leases contained in a contract for their assignment was insuffi-

cient to give notice to third persons, and defendant after suit was filed, but before notice of lis pendens was filed, transferred the leases, *held* that, under Rev. Civ. Code, art. 2453, relating to lis pendens, as well as Act No. 22 of 1904, the transferee of the leases takes them free from the claim of plaintiff; the description of the contract being insufficient.

### On Rehearing.

3. MINES AND MINERALS ⟨⟩74—CONTRACT FOR TRANSFER OF OIL LEASES HELD ONE FOR EARNEST ENTITLING VENDOR TO REPUDIATE ON PAYING TWICE AMOUNT OF EARNEST; "SALE"; "CONJUNCTIVE OBLIGATION"; "COMMUTATIVE CONTRACT."

Where a contract for the assignment of oil leases required plaintiff to pay the sum of $250 in cash, $1,000 from the proceeds of the first leases sold, and percentages to defendant on the other leases, and other provisions required plaintiff to act as agent for defendant as well as to bore a well, *held*, that the contract was not one of sale within Rev. Civ. Code, arts. 2439 and 2462, but instead created a conjunctive obligation as defined by article 2063, the contract being a commutative contract as defined by article 1768, and hence the provision for payment of $250 must be deemed a payment of earnest within article 2463, and defendant was entitled to repudiate the agreement on repaying twice the amount of the earnest.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Commutative Contracts; Sale; First Series, Conjunctive Obligation.]

4. SPECIFIC PERFORMANCE ⟨⟩28(1), 51—UNCERTAIN AND INEQUITABLE CONTRACTS NOT ENFORCEABLE.

Courts will not specifically enforce an uncertain and inequitable contract.

5. EQUITY ⟨⟩66—HE WHO SEEKS SPECIFIC PERFORMANCE MUST DO EQUITY.

He who seeks equity at hands of court, as in a suit for specific performance, must be or place himself in a position to do equity to the other side.

6. SPECIFIC PERFORMANCE ⟨⟩73 — CONTRACT REQUIRING CONTINUED SUPERVISION OF COURT WILL NOT BE ENFORCED.

Where the contract would require continued supervision by the court and required personal services by both parties which neither could be compelled to perform, specific performance will be denied.

Provosty and O'Niell, JJ., dissenting.

Appeal from Third Judicial District Court, Parish of Claiborne; J. E. Reynolds, Judge.

Suit by John Y. Snyder, trustee, against A. E. Wilder. From a judgment for monetary damages, plaintiff appeals. Affirmed.

Thatcher & Smitherman and Thigpen & Herold, all of Shreveport, for appellant.

Joseph H. Levy, Foster, Looney & Wilkinson, Wilkinson & Lewis, and Barnette & Blanchard, all of Shreveport, for appellee.

PROVOSTY, J. [1] The object of this suit is to compel specific performance of the agreement of the defendant, Wilder, to transfer and assign to plaintiff certain oil leases as appears by the following contract:

"Articles of agreement made and entered into this day by and between A. E. Wilder, of Homer, La., party of the first part, and J. Y. Snyder, of Shreveport, La., acting as trustee, party of the second part:

"The said A. E. Wilder, party of the first part, agrees to transfer and assign certain leases he holds and owns in and around Homer, La., approximating 20,000, twenty thousand acres, as per map now in possession of said Snyder and more clearly represented as land included in first and second hatched lines. The said Wilder further agrees to secure leases on all of the other land within or extending into the said hatched lines as far as possible as shown on said map and to include in said transfer or assignment such leases, up to the completion or abandonment of first test well.

"In consideration of such assignment and transfer said Snyder agrees to pay said Wilder two hundred and fifty dollars ($250.00) in cash, and one thousand dollars from the proceeds of the first leases sold. On all other leases which said Snyder may sell the said Wilder shall receive one-half of the money received and one-half of any excess royalty which may be reserved by the said Snyder, except that after said Wilder has been paid $1,000.00, as above provided, then the next $10,000.00, ten thousand dollars, received for the sale of leases may be applied to the drilling of a deep test well.

"On any leases not sold by said Snyder, but upon which said Snyder shall develop oil or other production, the said Snyder agrees to reserve and pay to said Wilder one twenty-fourth excess royalty.

"In case said Snyder shall after development sell all of the remaining holdings in bulk, then the said Wilder shall receive 10 per cent. of the proceeds of such sale, and said Wilder shall after the receipt of said 10 per cent. proceeds relinquish his excess royalty of one twenty-fourth on said property in bulk so sold.

"The said Wilder further agrees to appoint and constitute the said Snyder his fiscal agent for certain leases held by the said Wilder outside of the hatched lines shown on said map, or which may hereafter be taken by said Wilder outside of such hatched lines up to the production or abandonment of the first test well. The said Wilder agrees that the said Snyder shall receive 50 per cent. of proceeds of all sales of said leases together with 50 per cent. of all excess royalties.

"Said Wilder agrees to have re-signed any leases now held not conforming to the lease blanks furnished by said Snyder, so that all leases under this agreement will eventually be taken on the blank forms furnished by said Snyder.

"Said Snyder further agrees that he will begin operations for the drilling of a deep test well within 60 days after said Wilder has transferred and assigned to said Snyder all the leases which Wilder can secure within the hatched lines shown on the map before referred to.

"Wherever this agreement refers to or mentions 'Snyder' it is understood to mean J. Y. Snyder, trustee, and wherever this agreement refers to 'Wilder' it is understood to mean A. E. Wilder.

"The said J. Y. Snyder, trustee, has this day paid the said A. E. Wilder, the sum of two hundred and fifty dollars ($250.00), the receipt of which is hereby acknowledged, being the $250.00 due A. E. Wilder under the provisions of paragraph 3, page 1, of this agreement, and the failure of J. Y. Snyder, trustee, to carry out the other terms of this agreement shall act as a forfeiture of this $250.00 and nullify this agreement as to both parties.

"Thus done and signed by both parties to this agreement in presence of attesting witnesses, this 14th day of September, 1916.
                              "A. E. Wilder.
                              "J. Y. Snyder."

An exception of no cause of action was overruled below. It was based on the supposed vagueness of the description of the leases to be transferred. The leases were all of record, and hence for identifying them as between the parties a mere reference to them was sufficient. In the petition they

are described with particularity. The exception was properly overruled.

[2] The answer denies separately every allegation of the petition, and then pleads specially that the $250 mentioned in the contract was earnest money, and that, in consequence, the defendant was at liberty to withdraw from the contract by paying to plaintiff double that amount. The trial court sustained the defense and gave plaintiff judgment for $500, and dismissed the demand for specific performance.

Defendant answered the appeal, praying that the exception of no cause of action be sustained, and that otherwise the judgment be affirmed. We understand this to be a prayer that the judgment for the $500 be affirmed in the event the exception of no cause of action is not sustained.

We will affirm the judgment, but not for the reason of the said $250 having been earnest money; for in our opinion it was not. The obligations evidenced by the contract were to be performed successively. First it was to be the payment of $250; then the transfer; then the other obligations. The $250 having been paid, the transfer has in regular order to be made. What may or may not have to be done hereafter is a matter in the future, and not involved in the present suit. It is a bridge to be crossed when come to. The $250 was all that was required to be presently paid or done in order that the making of the transfer should become absolutely and immediately obligatory. It was the entire consideration the payment or the performance of which was to precede the making of the transfer. It was the total price to be paid until the transfer should have been made. It could not therefore have been earnest money, since earnest money is the payment of a part of the price, either for binding the contract ("Quod ante pretium datur et fidem facit contractus facti, totiusque pecuniæ solvendæ"), or, in the in-

tendment of Code, art. 2463, for retaining the liberty "to recede from the promise." Smith v. Hussey, 119 La. 38, 43 South. 902. How could Snyder recede from paying the amount required for obtaining the transfer when he had already paid it in full? His other obligations were only to be performed afterwards. It is only with the transfer we are concerned in this suit. Specific performance is not asked of anything else, non constat that any trouble would ever arise in connection with the other obligations of the contract.

The ground on which we think the judgment has to be affirmed is. that, owing to the insufficiency of the description of the leases in the contract, the recording of the contract was not sufficient registry to bring notice to third parties, and that at the time the present suit was filed and the notice of lis pendens recorded Wilder had already transferred most of the leases to the Atlas Oil Company, thereby putting it out of his power to make the transfer to plaintiff.

The present suit was filed and the notice of its pendency was filed for registry on November 23, 1916. The transfer to the Atlas Oil Company had been made six days previously, on November 17, 1916. The transfer to the Atlas Company was not recorded until some time later.

The learned counsel for plaintiff recognize that ordinarily specific performance cannot be ordered when the defendant no longer has it in his power to perform; but they contend as follows:

That, "since nothing done after the filing of the notice of lis pendens could in any manner affect the rights of plaintiff, and since under our system of law the specific performance of the obligation to sell does not operate exclusively through judgment in personam, but by a decree of the court which acts to translate the property (Anse la Butte Oil & Mineral Co. v. Babb, 122 La. 426 [47 South. 754]), the court cannot be divested of its right to carry out the contract by the act of the defendant in parting with the subject-matter."

It is doubtful whether the description of the leases is sufficient even in the notice of lis pendens which was filed for registry; for while the names of the lessors and the number of acres leased are there given, the lands leased are not otherwise described than as being "particularly shown on map and plat filed as original No. ——— and maps and plats filed as original acts Nos. ——— of the Conveyance Records of Claiborne Parish," and as being "situated in T. 20 N., R. 6, 7, and 8 W., T. 21 N., R. 6, 7, and 8, and T. 22 N., R. 6, 7, and 8 W., Claiborne parish."

But, granting for argument this description to have been sufficient for letting third persons know what particular lands were involved in this suit, we think the registry came too late, as the defendant had then already alienated most of the leases and put it out of his power to make the transfer sued for.

Whether, if the contract had sufficiently described the leases for its registry to have conveyed notice to third persons, and if the Atlas Company were a party to this suit, the court might not enforce the rights of plaintiff as of the date of this registry, according to the principle, first in registry, first in right, and on the theory of a promise of sale being equivalent to a sale even to the extent of conveying ownership, is a question that need not be considered; for the registry plaintiff is relying on is not that of the contract, but of the lis pendens, and lis pendens operates only to prevent a future alienation by the defendant, not to undo one already accomplished. Its effect is prescribed by article 2453 of the Code, which reads:

"The thing, claimed as the property of the claimant, cannot be alienated, pending the action, so as to prejudice his right. If the judgment be rendered for him, the sale is considered as a sale of another's property, and does not prevent him from being put in possession by virtue of such judgment."

And the sole effect of the registry of the notice of lis pendens is to convey to third persons notice of the pendency of the suit. Act 22, p. 25, of 1904. The effect was to prevent the defendant from alienating, not to prevent the Atlas Company from recording, the title it had already acquired.

Judgment affirmed.

MONROE, C. J., takes no part, not having heard the argument.

O'NIELL, J., dissents.

DAWKINS, J., concurs in decree.

### On Rehearing.

DAWKINS, J. In our former opinion we overlooked the fact that the points upon which we decided this case had not been raised by the pleadings; hence were constrained to grant a rehearing in order to pass upon the issues presented by the record.

Further consideration has caused us to change somewhat our views upon the following questions, to wit:

(1) As to whether or not there was a giving of earnest money; and

(2) As to the nature of the contract being such as will permit the court to render a decree for a specific performance that will work substantial justice between both sides.

[3] A careful reading of the contract, quoted in full in our former opinion, will disclose that it is what might be called a mixed agreement for the sale or transfer of mineral leases, and for the doing or performing of certain acts and things on the part of the transferee, some of which looked to the development of the property for oil and gas, and others to the marketing of the leases and a division of the profits. It is not a contract carrying a promise of sale, pure and simple, as contemplated by the Civil Code, for the consideration in such a case can be nothing but money.

"The contract of sale is an agreement by which one gives a thing for a price in current money, and the other gives the price in order to have the thing itself." R. C. C. 2439.

Even that portion of the consideration which is stipulated to be paid in money is not fixed, nor can it be made certain, for a part of it is to be a percentage of the proceeds of leases which the transferee may sell in the future, and at such prices, apparently, as he may choose to fix. Therefore there was no fixed price, and consequently the agreement does not fall within that class contemplated by article 2462 of the Code, cited and relied upon by plaintiff, and which reads as follows:

"A promise to sell amounts to a sale, when there exists a reciprocal consent of both parties, as to the thing and the price thereof. * * * "

In a number of its features the agreement partakes of the nature of a contract of employment, under which Snyder is to sell some of the leases and to remit a percentage to Wilder, and to bore a deep test well within 60 days; but, in view of the peculiar wording of the document, it is questionable as to whether Snyder really obligates himself to do anything other than pay the $250 cash, $1,000 out of the proceeds of the first leases sold, and to "begin operations for the drilling of a deep test well within 60 days after said Wilder has transferred and assigned to said Snyder all the leases which Wilder can secure within the hatched lines shown on the map before referred to"; in other words, the time and manner of doing the things which, from the very nature of the agreement, we are compelled to conclude was the main object or consideration for the promise to transfer, are not only left entirely to the discretion of the transferee (except the beginning of the test well), but he nowhere binds himself to perform them; and even as to that part which he does agree to perform he reserves the right to withdraw or recede by forfeiting the $250 paid at the signing of the contract, by the following clause, viz.:

"The said J. Y. Snyder, trustee, has this day paid the said A. E. Wilder, the sum of two hundred and fifty dollars ($250.00) the receipt of which is hereby acknowledged, being the $250.-00 due A. E. Wilder under the provisions of paragraph 3, page 1, of this agreement, *and the failure of J. Y. Snyder, trustee to carry out the other terms of this agreement shall act as a forfeiture of this $250.00 and nullify this agreement as to both parties.*" (Italics ours.)

It is thus seen that the cash stipulated to be paid forms only an insignificant part of the total consideration to flow to Wilder for the transfer, and even as to that Snyder may decline to accept the transfer when tendered by Wilder upon forfeiting the amount so paid. Consequently it was to serve either one of two purposes: First, to be a portion of the consideration, if Snyder chose to perform the agreement; and, second, it was to pay for the privilege of withdrawing if he did not see fit to proceed further. Certainly, as to the latter alternative, it could have been nothing other than earnest money, under the plain letter of the law.

"But, if the promise to sell has been made with the giving of earnest, each of the contracting parties is at liberty to recede from the promise, to wit, he who has given the earnest by forfeiting it, and he who has received it by returning the double."

Counsel for the plaintiff makes the ingenious argument that all of the purchase price had been paid, and that the transferee was not to pay or perform anything more until the conveyance had been made. However, an analysis of the agreement will show that this was not entirely true. We are bound to assume that in executing the deed or act of transfer the parties would have recited all of the considerations, and that Snyder would have undertaken and bound himself to do those things which the preliminary agreement had provided he should do, or at least that Wilder would have had the right to exact that he do so. At that stage, and at any other time, before or after, he could have

declined with no other result as to himself than the forfeiture of the $250. It was not a case of alternative obligations as contemplated by article 2066 et seq. of the Code, for Snyder was not given the option of paying $250 or of performing the other stipulations of the contract as the consideration for the transfer, because both had to be done if the conveyance were made, and the obligations were therefore conjunctive, and fell within the purview of article 2063 of the Code, which we quote, to wit:

"A conjunctive obligation is one on which the several objects in it are connected by a copulative, or in any other manner which shows that all of them are severally comprised in the contract. This contract creates as many different obligations as there are different objects; and the debtor, when he wishes to discharge himself, may force the creditor to receive them separately."

If there had been an unqualified promise to sell with a corresponding obligation to buy, and the other considerations of the agreement had been susceptible of immediate and exact performance, unquestionably Snyder could have exacted performance; but at every stage of the execution as it is, he will be at liberty to withdraw upon forfeiting the money paid. What is the price paid for this privilege? It is the $250. Hence, if he enjoys this right, when called upon to accept the transfer, it would seem that, under the clear language of the Code, Wilder has the corresponding privilege of withdrawing upon forfeiting double this amount, or $500. Besides, the mere execution of the act of transfer is not all that Wilder is to do under the contract, as will be seen from the following clauses quoted therefrom, viz.:

"The said Wilder further agrees to appoint and constitute the said Snyder his fiscal agent for certain leases held by the said Wilder outside of the hatched lines shown on said map, or which may hereafter be taken by said Wilder outside such hatched lines up to the production or abandonment of the first test well. The said Wilder agrees that said Snyder shall receive 50 per cent. of proceeds of all sales of said leases, together with 50 per cent. of all excess royalties.

"Said Wilder agrees to have re-signed any leases now held not conforming to the lease blanks furnished by said Snyder, so that all leases under this agreement will eventually be taken on the blank form furnished by said Snyder.

"Said Snyder further agrees that he will begin operations for the drilling of a deep test well within 60 days after said Wilder has transferred and assigned to said Snyder all of the leases which Wilder can secure within the hatched lines shown on the map above referred to."

So that there are many reciprocal obligations yet to be performed on the part of both parties which, as to Snyder, were all beyond the power of the courts to enforce, if he chooses not to perform them. And again we ask why? Likewise again we answer, because he has paid a sum for the forfeiture of which he has the right to withdraw. The privilege of declining or withdrawing undoubtedly applies to the performance of any other act on the part of Snyder after the signing of the agreement and the payment of the $250. There is clearly an implied obligation on his part to accept the transfer on the terms stipulated, and to become the fiscal agent of Wilder for the sale of leases outside the hatched lines, and, if he declines, the matter indisputably will be at an end.

"Earnest [in the civil law] is a sum of money which one of the contracting parties delivers to the other at the time of the contract, and is presumed to be a forfeit, in the absence of evidence that the parties intended to bind themselves then and there by an irrevocable contract."

"Where earnest is given, either party may recede, the giver by forfeiting the earnest, and the receiver by returning the double. Rev. Civ. Code, art. 2463."

Legier v. Braughan, 123 La. 463, 49 South. 22, and authorities therein cited.

See, also, Smith v. Hussey, 119 La. 32, 43 South. 902; Capo v. Bugdahl, 117 La. 992, 42 South. 478.

Aside from the question of the giving of earnest, there are other serious legal and equitable obstacles which preclude the specific performance of the contract in this case. The established rule in the Code is that one is not entitled to enforce specific performance of a contract, but only to damages for its breach, save in those cases where damages would be inadequate. R. C. C. art. 1926 et seq. It is contended that in this case damages would be inadequate to compensate Snyder for the refusal of Wilder to convey the leases; yet, when we turn to the contract, we find that the proposed vendee has fixed the damages which he shall pay for refusal to perform on his part at the sum of $250; while the Code has fixed the amount which the vendor shall pay at double that sum, or $500. C. C. 2463. No one would contend that Wilder could enforce specific performance if Snyder refused. We therefore quote the following articles of the Code, which we think have an important bearing upon the conclusions to be drawn from such circumstances:

"Art. 1767. Contracts, considered in relation to their substance, are either commutative or independent, principal or accessory.

"Art. 1768. Commutative contracts are those in which what is done, given or promised by one party, is considered as equivalent to, or a consideration for what is done, given or promised by the other."

"Art. 1770. A contract containing mutual covenants shall be presumed to be commutative, unless the contrary be expressed."

"Art. 1799. It is a presumption of law that in every contract each party has agreed to confer on the other the right of judicially enforcing the performance of the agreement, unless the contrary be expressed, or may be implied."

It will be seen that the definition of a commutative contract fits perfectly the agreement in this case, and a fair inference or presumption would therefore arise that, if the vendee were not bound to a specific performance, neither would be the vendor. But we are not left to inference or presumption, for the Code itself has fixed the rights of the vendor in such circumstances by permitting him to withdraw upon the payment of double the price which the vendee has given for that privilege.

"Whenever, therefore, whether from personal incapacity to contract, or the nature of the contract, or any other cause, the contract is incapable of being enforced against one party, that party is equally incapable of enforcing it against the other, though its execution in the latter way might in itself be free from the difficulty attending its execution in the former." Fry's Spec. Per. (3d Ed.) 440.

"The court will not decree that one party shall specifically perform a contract which the other party, at its option, may refuse to carry out. It is of the essence of a decree that it should be mutually binding and conclusive on both parties. It would be an idle formality for the court to enter a decree against the defendants in this case, for the reason that complainant has the right to render the decree ineffective at any moment that it pleases." Federal Oil Co. v. Western Oil Co., 112 Fed. 376; Id., 121 Fed. 677, 57 C. C. A. 428; Rutland Marble Co. v. Ripley, 10 Wall. 339, 359, 19 L. Ed. 955; Karrick v. Hannaman, 168 U. S. 328, 336, 18 Sup. Ct. 135, 42 L. Ed. 484.

[4-6] Again, we cannot render an enforceable decree that will compel even Wilder to perform all of his obligations under the contract; for it provides that he shall obtain other leases within the hatched lines, and that he shall appoint Snyder his fiscal agent for the handling of leases without those lines. How could we compel him to obtain or make contracts with third persons, or who could say when he had obtained all of such leases which it was possible to obtain, or how could the court compel him to enter into a contract of employment with Snyder of the kind designated in the agreement as "fiscal agent"? Can we separate those features which may be enforced from those which cannot, and compel the performance of the one without the other? We think not. In order to have the exceptional relief of a specific performance, the court must be able to take hold of the entire subject-matter and

to render such a decree as will work a reasonably complete execution of the contract as to both parties; otherwise the case is one for damages and not for performance.

The agreement in this case is what is termed by the text-writers and in the jurisprudence a continuing contract; in other words, it is not one which may be completed by the signing of a deed and the payment of the price, as in the case of a sale, but contemplates the performance of obligations on the part of both parties, extending over a long period of time, perhaps months, maybe years, most, if not all, of which on the part of Snyder are such that the courts could never enforce. We could not compel him to make sales of leases for prices left entirely to his discretion; neither could we compel him to drill an oil well. All that we could do would be to order Wilder to execute the act of transfer of the leases, and upon his failure or refusal direct that our decree should operate as a transfer. Thereafter Snyder might refuse to perform the many provisions of the agreement stipulated on his part, and, even in the absence of the reserved right to withdraw, we would be powerless to coerce him. Of course, it may be said that in that event he would have violated the agreement, and Wilder would be entitled to have it annulled and the leases returned. This, however, would entail another lawsuit, and then it would become a question of determining whether or not there had been a reasonable performance of the terms of the contract, under stipulations which leave so much to the discretion and judgment of the transferee that men of equally honest and intelligent judgment might readily differ as to whether or not it had been fulfilled. Courts will not attempt to enforce such an uncertain and inequitable contract. He who seeks equity at the hands of the court (a suit for specific performance of a contract being an appeal to the equity powers of the courts) must be or place himself in a position to do equity to the other side. Such is not the case in the present instance.

"Indeed, it is generally held that the mere fact that a decree for specific performance will require the constant superintendence by the court of the execution of a contract continuing through a long period of time is sufficient reason for denying the relief." Lone Star Salt Co. v. Texas S. L. R., 99 Tex. 445, 90 S. W. 867, 3 L. R. A. (N. S.) 835, and authorities cited in opinion and note.

For the reasons assigned, our former decree is reinstated and made the final judgment of this court.

PROVOSTY and O'NIELL, JJ., dissent.