PETROLIA MFG. CO. v. JENKINS et al.

(Supreme Court, Appellate Division, First Department. May 20, 1898.)

1. CONTRACT—BREACH—EVIDENCE.
  A contract by which the defendant undertook to purchase exclusively from plaintiff all the "Coal Oil Johnny Soap" he might need for purposes of sale did not define the composition of the soap referred to. In an action involving the construction of the contract, it appeared that, for the greater part of several years prior to the contract, the defendant had bought and disposed of so-called "Coal Oil Johnny Soap," containing no petroleum or a very small percentage, though his trade-mark declaration called for a "liberal use" of it. That manufactured by plaintiff contained only a slight percentage, but had never been objected to by defendant's agent, who supervised its manufacture. Held, that the absence of petroleum as an important ingredient did not constitute a breach of the contract by the plaintiff.

2. SPECIFIC PERFORMANCE—RELIEF IN EQUITY.
  The parties defendant, who were jointly to buy the soap according to the agreement, were an individual and a corporation. The former was insolvent. Held, in an action to compel them to perform accordingly, that such insolvency would in itself justify a resort to equity for the relief sought.

3. SAME—CONTRACT—SUBSTANTIAL PERFORMANCE.
  By the contract between the parties, the plaintiff undertook to provide a plant with a capacity of 400 boxes a day. In fact, the plant provided had a capacity of only 200 boxes, though it might have been readily increased if required; but the amount called for by defendant had never exceeded the 200. Held, that the plaintiff had substantially fulfilled its agreement.

4. SAME—MUTUALITY.
  Specific enforcement of a contract in equity cannot be refused on the ground of lack of mutuality, where performance by the defendant necessarily presupposes the doing of some complementary act by the other; as, for example, a covenant by the defendant to buy a specified soap from the plaintiff only, presupposes one by the plaintiff to supply it.

5. INJUNCTION—FUTURE ACTIONS.
  It is no objection to an injunction that it looks to the future, and prescribes or forbids a course of conduct; for equity frequently undertakes to prevent a succession of acts merely in order to avoid the necessity of suing at law upon each.

6. ACTION—DISMISSAL.
  The fact that a complaint alleges that one of the defendants made the contract in suit "in his own name, but in fact as agent for and on behalf of" another defendant, does not justify a dismissal of the complaint as to the former; certainly, in the absence of any allegation that he disclosed his principal, and assumed to act for him.

7. CORPORATIONS—ACTS OF PRESIDENT.

Where a corporation constitutes its president its universal agent, it is bound by any act of his; at least, by all such as are within the corporate powers.

Ingraham, J., and Van Brunt, P. J., dissenting.

Appeal from special term, New York county.

Action by the Petrolia Manufacturing Company against Maross Jenkins and the Coal Oil Johnny Soap Company. From a judgment for plaintiff, defendants appeal. Modified.

The action is brought upon a written contract, executed March 28, 1896, between the defendant Maross Jenkins and the plaintiff's assignors, James R. Pitcher and Aubrey H. Martin. By this contract, Pitcher & Martin agreed to obtain a suitable building in the city of New York, and place therein a plant for the manufacture of certain brands of soap, known as "Coal Oil Johnny," "Petrolia," and "Balm of Gilead," the plant to have a capacity of not less than 400 boxes a day. They also agreed to organize a corporation with a capital stock of $100,000, and set apart for Mr. Jenkins $10,000 thereof, which should be retained until the accumulated dividends equaled the par value, and then delivered to him. Mr. Jenkins agreed to purchase exclusively from Messrs. Pitcher & Martin, for a period of 20 years, all the Coal Oil Johnny soap which he should need for purposes of sale, except eight-ounce bars thereof. This exception was due to an outstanding contract by Mr. Jenkins with the firm of Bell & Bogart to purchase the eight-ounce bars from them. The defendant the Coal Oil Johnny Soap Company is a New Jersey corporation, organized in March, 1894, of which Mr. Jenkins has been the president throughout. On June 19, 1896, he, as such president, executed an agreement whereby the company, in consideration of the covenants and agreements contained in the contract of March 28, 1896, ratified and confirmed said contract; "the intention being to make said Coal O. J. Co. and said J. [Jenkins], as pres. thereof, liable under said agreement, as tho' the same were executed by him as such pres. originally." The judgment appealed from awards damages jointly and severally against the two defendants for a breach of the covenants in the contract, and enjoins their further violation. Further facts are stated in the opinion.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, O'BRIEN, and INGRAHAM, JJ.

George L. Danforth, for appellants.

W. A. Jenner, for respondent.

BARRETT, J. The defense mainly relied upon is the alleged failure by the plaintiff to fulfill the covenants to be performed by its assignors under the contract of March 28, 1896. The principal breach alleged is a failure to manufacture and deliver true Coal Oil Johnny soap, within the meaning of the contract. The contract does not define the composition of the soap, and a resort to extrinsic evidence became necessary. A great variety of parol proof was taken, which can be only briefly considered.

The objection of the defendants to the soap was that it did not contain a sufficient quantity of petroleum. Coal Oil Johnny soap was first made for Jenkins (who was a soap dealer, but not a manufacturer) in 1893, by one Burk. Burk testifies that he put no petroleum in it. He continued to make the soap in 1894 and 1895, in the same manner throughout. In 1895 one Grant manufactured the soap at his factory, in Pleasantdale, N. J., for the firm of Bell & Bogart, who sold it to Jenkins. The evidence shows that at first he put in about 3 per cent. of petroleum, but later ceased to use it

at all. Towards the close of 1895, and during 1896, Bell & Bogart made the soap for Jenkins, at a factory in this city. The preponderance of evidence justifies the conclusion that the soap manufactured by this firm contained about 4 per cent. of petroleum. Jenkins registered the trade-mark for the soap in February, 1894, and in his declaration stated that it was made "with a liberal use of petroleum"; but, as has been seen, for a long time thereafter he bought and sold soap which had none at all. From these and other facts, the trial court was called upon to decide whether the plaintiff's soap, which at first contained no petroleum, and at no time more than six-tenths of 1 per cent. thereof, substantially complied with the contract. The defendants contend that the contract referred to the Coal Oil Johnny soap which Bell & Bogart were then making. There is just as much reason for holding that the reference was to the original soap manufactured by Burk, which contained no petroleum. During the greater part of the time that Jenkins dealt in Coal Oil Johnny soap, he bought and disposed of soap containing no petroleum, or but a very small percentage thereof; and, prima facie, the finding is justified that the parties did not contemplate the manufacture of a soap in which petroleum was an important ingredient. It is true that Jenkins testifies that Grant, in the fall of 1895, had furnished him a sample of soap, containing a considerable quantity of petroleum, which proved very satisfactory, and that he insisted that the soap, to be made under the contract, should be in accordance with Grant's formula, and contain what he calls a "commercial amount of petroleum." Grant's relation to the transaction thus becomes material, and, in fact, furnishes a complete answer to this contention. He was Jenkins' agent to supervise the output of soap from the plaintiff's factory. As Jenkins himself says:

"I said that without Mr. Grant's supervising the factory and taking full charge of it, as he was a practical soap man, I would not sign a contract. If he would not be retained to look after the crude oils and the sodas and the petroleum and the machinery, and to have absolute charge of the business, I would not sign it."

The plaintiff supplements this by abundant evidence that, though not employed by it, Grant was constantly present at the factory, supervising the manufacture of the soap. That Grant was receiving from Pitcher & Martin a royalty for services already rendered in no way disturbs the inference from these facts that he was the defendants' representative, authorized to pass upon and approve the quality of the soap.

The plaintiff shows quite conclusively that the soap which it delivered to Jenkins was approved by Grant. He had little or nothing to do with the actual process of manufacture; but he saw it when made, and commended it, and it was sent to Jenkins with his authority. It is evident that all objections originated with Jenkins, not with Grant. Beginning, apparently, with a letter written September 16, 1896, Jenkins commenced to complain of the soap, because it did not contain a sufficient quantity of petroleum. He assigns two reasons,—the necessity of protecting his trade-mark, and the necessity of protecting and increasing his trade. It is quite evident that the first reason is the true one. He had become involved in

difficulties with other soap dealers, and was threatened with prosecution for failing to have his soap conform to his filed statement. This is the reason which he himself assigned for his position when Pitcher called upon him, after the letter of September 16th; and it was evidently what actuated him principally in writing that letter. His own testimony reinforces that of Pratt, plaintiff's operator, who says that Grant told him to put just enough· petroleum in the soap to satisfy Jenkins. It is plain that Grant was satisfied with the soap, and it is a fair inference that Jenkins (despite some unsatisfactory evidence as to loss of custom) was merely endeavoring to protect his trade-mark. But the plaintiff was not bound to manufacture in accordance with this trade-mark, which had been departed from for months when his assignors made their agreement. It fulfilled its whole duty when it made what Jenkins had for years been receiving as such, and what Jenkins' agent, Grant, was satisfied to accept.

The alleged breach which we have considered is the only one which Jenkins assigned as a reason for terminating the contract. The others now urged may be briefly. disposed of. It is said that the plaintiff's plant was not a proper Coal Oil Johnny plant. What has been said is a sufficient answer. If the soap furnished complied with the contract, the plant must have been sufficient. We need only add that the trial judge would have been amply justified in finding that a plant like the plaintiff's, ostensibly made for the manufacture of "Petrolia" and "Balm of Gilead" soap, was competent to make "Coal Oil Johnny" also.

It is said that the plaintiff's plant could not make 400 boxes of soap a day. The evidence tends to show that, although the plant had turned out as many as 400 boxes in a day, yet that it could not do so day in and day out without certain additions. But the necessity for these additions never arose; and we think that the plaintiff substantially fulfilled its agreement when it built a plant which was adequate for all existing needs, and which, when it became necessary, might readily have been put into shape to manufacture the full quantity of soap specified in the contract.

The contract did not so lack mutuality as to prevent its enforcement in equity. There was a plainly implied covenant on the plaintiff's part to furnish to the defendants the soap necessary in their business up to the limit of capacity of the plant contracted for. The defendants could obviously not buy the soap unless the plaintiff supplied it for sale; and, where performance by one party to a contract presupposes the doing of some act by the other, a covenant on the part of the latter is implied, for the breach of which there may be a rescission or an action for damages. Mansfield v. Railroad Co., 102 N. Y. 205, 6 N. E. 386.

There is no other valid objection to an action for specific performance. The plaintiff should not be remitted to an action at law for many reasons. It is sufficient to mention the insolvency of the defendant Jenkins (of which there was adequate proof), which always justifies the assumption of jurisdiction by equity (Lindsay v. Jackson, 2 Paige, 581), and that otherwise a multiplicity of actions will be necessary as continuing breaches occur.

This case is not like Fargo v. Railroad Co., 3 Misc. Rep. 205, 23 N. Y. Supp. 360, and the cases there cited. It was there said.

"The contract is exceedingly comprehensive, and its working details are most minute. These details almost invariably provide for special and varying contingencies, and the elements of discretion and judgment with regard to such contingencies abound. It is apparent that the due execution of such a contract must involve the ascertainment of what it is right and proper that the parties should do from day to day with regard to ever-varying circumstances."

There is here no multiplicity of agreements, applicable to a variety of contingencies, and calling for the exercise of discretion, but a single covenant to purchase. The precise scope and meaning of the agreement are beyond doubt. It is no objection to an injunction that it looks to the future, and prescribes or forbids a course of conduct. In fact, equity is frequently invoked to prevent a succession of acts merely in order to avoid the necessity of suing at law upon each.

It is contended that the complaint should have been dismissed as to the defendant Jenkins, at least. This contention is based upon an allegation in the complaint that he made the contract in suit "in his own name, but in fact as agent for and on behalf of" the defendant corporation. If the complaint had also stated that he disclosed his principal, and assumed to act for him, there might, perhaps, be force in the argument. Without such disclosure, however, it is plain that Mr. Jenkins is personally liable. The proof, with which the allegations of the complaint in no way conflict, shows that the plaintiff's assignors and officers did not know of the existence of the company till some time after the contract was executed.

It is said that Mr. Jenkins had no authority to execute the agreement of June 19, 1896, in behalf of the defendant corporation. The evidence tends strongly to show that he was, in truth, the sole proprietor of the company; that it was merely a name under which he did business. He disputes this, however, and we need not consider the evidence in detail. What does appear conclusively is that he was in complete and absolute control of the affairs of the corporation. It performed no acts except through him and his immediate employés and subordinates. Ordinary rules and presumptions have no application to such a case. Doubtless, the president of a corporation has not usually power, in the ordinary course of business, to execute such an agreement. But, where a corporation constitutes its president its universal agent, it is bound by any act of his; at least, by all such as are within the corporate powers. It is said that this agreement was ultra vires, because the certificate of incorporation states that "the objects for which the company is formed are to manufacture soaps and oils, and to sell the same." We think that a fair construction of these words permits the corporation to sell soaps other than those of its own manufacture. If otherwise, however, the facts show such laches on the part of the shareholders as must now estop them from setting up this defense.

Judgment was properly rendered against the defendants jointly and severally. The defendant Jenkins was personally liable under the original contract, and he was never released from this liability. The effect of the second agreement was to give to the plaintiff's as-

signors the benefit of the additional liability of the defendant corporation.

It is said that the judgment is too broad, since it absolutely enjoins the defendants from breaking their covenant, regardless of what the plaintiff may do. It is doubtful whether anything in the judgment would estop the defendants in case of a future breach by the plaintiff; but, for the sake of clearness and certainty, the judgment should be modified so as to provide that the injunction is conditional upon the plaintiff's performance of its obligations under the contract. As thus modified, it should be affirmed, with costs to the plaintiff. All concur, except INGRAHAM, J., and VAN BRUNT, P. J., dissenting.

INGRAHAM, J. I dissent. The judgment entered enjoins and restrains, for a period of 20 years from March 28, 1896, the defendants, and each of them, from buying and selling or dealing in soap under the name, brand, or trade-mark of "Coal Oil Johnny's Petroleum Soap," or any colorable variation thereof, liable to deceive the public, except the soap procured from the plaintiff or its assigns, excepting only such soap as they, or either of them, may procure from Messrs. Bell & Bogart, or their assigns, until the 16th of July, 1900; and, further, that the defendants, and each of them, be enjoined and restrained from resorting to any other subterfuge to render nugatory, by unfair business methods, the prohibitions of this court. The said judgment further gives to the plaintiff a money judgment for $19,802.06 for a violation by the defendants of this covenant. The terms of this judgment are somewhat remarkable. The action is brought to enforce a covenant to buy a certain amount of goods from the plaintiff; and, to enforce that covenant, the defendants are enjoined from buying or selling or dealing in soap under the name, brand, or trade-mark of "Coal Oil Johnny's Petroleum Soap," or any colorable variation thereof, liable to deceive the public, except the soap procured from the plaintiff or its assigns. It would seem that this injunction goes much further than a specific performance of the clause of the contract between the plaintiff and the defendants. I do not think that this clause of the contract is one that can be specifically performed in equity for two reasons:

First. The plaintiff has an adequate remedy at law for any breach of this contract by the defendants. The contract itself provides for the price to be paid to the plaintiff for the soap when delivered, and the price for which the defendants are to sell it. The plaintiff upon the trial proved the cost of manufacturing this soap. Thus, the defendants had no difficulty in proving, and the court has awarded judgment for, the damages that the plaintiff sustained in consequence of the alleged breach of the agreement by the defendants prior to the time of the trial. A specific performance of this agreement was not necessary to give to the plaintiff all the remedy that it was entitled to, namely, damages for the breach of the contract by the defendants. The contract is merely an agreement by the defendants to purchase all the soap of this brand that the plaintiff may sell,— that is, whatever soap the defendants sold should be purchased from

the plaintiff; and there would seem to be no difficulty in ascertaining just how much soap the defendants sold, and just what plaintiff would have made if such soap had been purchased from it.

I also think that, under the law of this state, this contract is one that the court should not specifically enforce. As was said by Lord Cranworth in Blackett v. Bates, 1 Ch. App. 117, "in order that the court may interfere, there must be mutual rights capable of being enforced by the court." The defendants could not have filed a bill for specific performance of the agreement of the plaintiff to procure the plant, and there is nothing in the agreement that requires the plaintiff to manufacture a cake of soap. See Marble Co. v. Ripley, 10 Wall. 339. It is entirely clear, moreover, that the injunction granted is too broad. The injunction is absolute, upon no conditions, but restrains the defendants from buying, selling, or dealing in this soap, except it be procured from the plaintiff or its assigns. The contract itself contains covenants to be performed on the part of the plaintiff, but nowhere does plaintiff agree to manufacture or sell to the defendants any of the soap that the defendants are to purchase. Some of these covenants, as will hereafter appear, have never been performed by the plaintiff; and the plaintiff is not now in a position to furnish to the defendants 400 boxes of soap per day, although it covenanted that it would procure a plant which would have a capacity of furnishing that amount. Nor does it appear that the plaintiff is or will be able to furnish to the defendants all the soap that they may require. The injunction is not conditioned upon such ability and inclination of the plaintiff to sell to the defendants all of such soap that they may wish to purchase. If the plaintiff should close its factory, and refuse to manufacture soap for the defendants, the injunction would still be applicable, and would simply close up the defendants' business. The difficulty of formulating an injunction which would make it applicable only to the case of the plaintiff's being able and willing to furnish all the soap that the defendants should require is, it seems to me, in itself an answer to an action of this character which seeks to enforce such an agreement. I think also that it clearly appears from the evidence that the plaintiff has never performed the agreement upon its part, has never manufactured the Coal Oil Johnny soap required by the defendants, but has distinctly and emphatically refused to manufacture and supply to the defendants the soap which they require for their business.

Under the contract, the parties of the first part (plaintiff's assignors) "agree to and with the said party of the second part to procure a building suitable for the purpose in New York City or vicinity, and to place therein a soap manufacturing plant for the manufacture of certain brands of soap known as 'Coal Oil Johnny,' 'Petrolia,' and 'Balm of Gilead,' which said plant shall have a capacity of not less than four hundred (400) boxes per diem." It seems to me that the evidence clearly shows that the plaintiff has never performed this covenant. Prior to the time that this contract was made, the defendant. Maross Jenkins and the defendant corporation had been manufacturing and selling a soap known as the "Coal Oil Johnny

Soap." On February 23, 1893, the defendant Jenkins had registered with the United States patent office a trade-mark for petroleum soap under the name of "Coal Oil Johnny's Petroleum Soap." Such trademark was adopted "for soap made with a liberal use of petroleum." This soap had been manufactured under the direction of one William A. Grant, who seems to have brought the plaintiff and the defendants into negotiation in regard to this contract, and who was trusted by both parties to furnish the formula and information necessary to manufacture the defendants' soap. Some time before the execution of this contract, and on February 11, 1896, Grant made a contract with the plaintiff's assignors by which he (Grant) agreed to select a building suitable for the purpose of manufacturing soap at a rent not exceeding $2,400 a year, which rental the plaintiff's assignors agreed to assume, and to construct, build, and erect therein a plant of machinery for the production of a certain kind of soap commonly known as "Petrolia," which said plant or machinery shall be so constructed as to produce 200 boxes of said soap per day, and agreed to deliver said plant or machinery within 30 days from the date thereof free from debt; and Grant agreed further to furnish an operator competent in all respects to run said machinery, the wages of whom were to be paid by the plaintiff's assignors, and to deliver to plaintiff's assignors a written formula under which the said Petrolia soap could be manufactured, and to instruct free of charge the plaintiff's assignors in all matters appertaining to the manufacture of the said brand of soap. And plaintiff's assignors agreed to pay to Grant the sum of $5,000 for the formula used in manufacturing a brand of soap known as "Balm of Gilead," and further agreed to pay to said Grant the sum of $10,000 for the plant and formula of Petrolia soap, the last installment of which was to be paid when the said plant or machinery was in all respects completed and ready to operate.

Under this contract, Grant procured a building, a lease of which was taken in the name of the plaintiff's assignors, and erected a plant which was capable of producing 200 boxes of soap per day, and received from plaintiff's assignors the sum of $15,000. The plant thus erected by Grant under this contract was the only plant that the plaintiff's assignors or the plaintiff ever constructed or procured, and the evidence is quite clear that this plant was not able to produce more than 200 boxes per day, and was also not constructed to manufacture a soap like that called for by the contract sought to be enforced in this action, which is entirely different in its character from the soap which was to be manufactured under the contract between Grant and the plaintiff's assignors. Grant himself testified for the defendants, and his testimony tended to show that this machinery was not fitted for making the Coal Oil Johnny soap, for reasons stated by him. Grant seems to have been the person relied upon by both plaintiff and the defendants for furnishing this formula to make this soap, and to superintend its manufacture; and his testimony is certainly not at all met by any testimony offered by the plaintiff as to the suitability of this machinery for making the Coal Oil Johnny soap as it had been made for the defendants,

and in the form and of the ingredients that they wished it made. Grant expressly testified—and I do not find that it is disputed—that it would require an expenditure of at least $75,000 to procure a plant capable of making 400 boxes daily of the Coal Oil Johnny soap. One of plaintiff's assignors testified that, after dissatisfaction had been expressed by the defendants with the soap the plaintiff was making, he asked Grant the cost of the machinery that would be necessary to put a larger amount of the petroleum in this soap, and that Grant answered that it would cost about $25,000. However, the plaintiff never did procure a plant that would make 400 boxes of soap per day. The only plant that it did procure was the one that Grant furnished under the contract made prior to the time of the execution of this agreement sought to be enforced, and that, it is clear, had not a capacity of manufacturing more than 200 boxes per day; and the plaintiff expressly refused, when required by the defendants and Grant, to furnish any more capital for the purpose of procuring a plant which could comply with the covenants of this contract. There was, however, a plant procured under which the plaintiff attempted to manufacture this Coal Oil Johnny soap; and there was evidence offered by plaintiff to show that, after the manufacture of the soap commenced, Grant was present, generally superintending the operation of the plaintiff's plant. Under Grant's direction, at first six pounds of petroleum, which would be about $6/10$ of 1 per cent., was used in the soap; and subsequently four pounds were substituted, which would be between $4\,5/10$ of 1 per cent. During this time the plaintiff endeavored to make this soap for the defendants, and a quantity of it was made and delivered to them; but on September 16, 1896, a letter was received from the defendant Jenkins in which he said that in order to protect his trade and to increase the same, also that he might protect his trade-mark against all comers, there needed to be a larger amount of petroleum put in Coal Oil Johnny soap at once:

"The quantity of petroleum you are now putting in is too small, and allows the soap to waste. If this can be overcome, I am confident that the sales would be many times larger than they ever have been. From the consumer, this is the only fault they have; and I believe that you will agree with me that a perfect soap is desirable in order to defy the whole world to produce its equal."

As no answer appears to have been made to this letter, on September 18, 1896, Jenkins wrote another letter to Pitcher, one of the plaintiff's assignors, and who was president of the plaintiff corporation, which is as follows:

"Upon information received from the patent office to-day, I find that it would be simply impossible for me to hold my trade or my brand if the Coal Oil Johnny soap is not made to contain a percentage of petroleum which would be of commercial use. With a soap so made, I can defy the whole world. Mr. Grant has assured me many times that this can be done; and, when I come out with a photo of the analysis of the Burk's Caoline soap, it will open the gates for him and others to shoot at my brand. I trust that you will be able to arrange this so that the very next batch of soap will be just what I am asking for."

Before this time it seems that Grant and the plaintiff had had some negotiations about procuring a plant which would enable the plaintiff to put more petroleum in this soap, and that Grant had said

that it would take a great deal of time, trouble, and money to make the changes; and, in answer to a question as to what it would cost, Grant said about $25,000. Pitcher swore that, subsequent to the writing of these letters, he called upon Jenkins, and that Jenkins referred him to Grant. Subsequently, on November 19, 1896, Jenkins wrote to the plaintiff as follows:

"Gentlemen: I send you by bearer an order for thirty boxes of Coal Oil Johnny's Petroleum soap, and have instructed you not to ship unless you can fill the order with soap containing petroleum to the amount of at least ten per cent. It is nearly three months since I notified you that I could not accept any Coal Oil Johnny's Petroleum soap unless it contained a commercial amount of petroleum."

The letter goes on to state the reasons why the defendants required that more petroleum should be put in the soap. The plaintiff did not fill this order, and since that no order has been received from the defendants. The plaintiff does not claim that it ever had a plant that was able to make the soap containing the amount of petroleum that the defendants demanded and required, or that they ever did make or offer to make any such soap for the defendants. Subsequent to the plaintiff's refusal to make the soap as required by the defendants, the defendants procured some of this soap from a corporation known as the "Bell & Bogart Soap Company"; and it would seem that this soap contained a much larger percentage of petroleum than that manufactured by the plaintiff, viz. about 4 per cent. of the body of the soap, while that manufactured by the plaintiff contained but four-tenths of 1 per cent.

It thus appears, without contradiction, that the plant that the plaintiff agreed to furnish, namely, a plant capable of manufacturing 400 boxes of this soap per day, was not furnished by the plaintiff. It also appears that the soap as actually furnished by the plaintiff contained a very small quantity of petroleum; that the defendants insisted that the soap as manufactured should contain more; that other manufacturers were able to manufacture a soap which did contain a very much larger quantity of petroleum; that the plaintiff refused to comply with the defendants' request to make the soap as they required it to be made, and refused to furnish such soap as defendants required. It seems to me that this was such a breach of the plaintiff's agreement under the contract as to preclude them from recovering in this action. At the time this contract was made, it does not appear that there was any formula for the manufacture of this soap. Grant seems to have been the only one who understood the process of manufacture. Experiments had been made in the manufacture of soap in which a considerable portion of petroleum had been used, and apparently with success; and the defendants, in registering their trade-mark, evidently contemplated a soap which would contain a substantial quantity of petroleum. It was this soap—a soap that would comply with the trade-mark which the defendants had registered, a soap which would be a petroleum soap, containing a substantial amount of petroleum—that the plaintiff's agreement required it to make. The defendants had the right to prescribe the formula to be used in the manufacture of the soap that

they were to purchase, and the plaintiff was bound, so far as practicable, to comply with their demands. It was the defendants' soap that was being manufactured. It was to be purchased by the defendants, and paid for by them; and as the contract did not contain any formula by which the soap to be manufactured by the plaintiff for the defendants was to be made, and as there was no proof that there was a special formula by which the soap had been made before, or that there was any understanding between the parties what the soap that the contract provided for was to be made of or how it was to be made, the formula to be used in the manufacture of the soap was necessarily such as should be prescribed by the defendants. The evidence is quite conclusive that a soap could be manufactured which would be commercially a valuable soap, with petroleum much in excess of the 10 per cent. required by the defendants; and the evidence conclusively shows that the only objection that the plaintiff had to manufacturing the soap called for by the contract was that it would require an additional outlay in procuring a plant suitable for such manufacture; and yet it was this plant which the plaintiff, by its contract, had agreed to furnish, and which it is conceded it never did furnish. The plaintiff was bound at least to make some effort to comply with the requirements of the defendants as to the soap that it should manufacture for them, and certainly the defendants were not bound to continue to receive from the plaintiff soap that they did not want and could not use; and, when the plaintiff refused to furnish them with a soap which complied with the order that they had given, I think it was the plaintiff that broke the contract, and not the defendants.

There was a great deal of evidence in the case as to whether or not the addition of this extra petroleum would improve the soap, but it seems to me that all of this testimony is immaterial. Looking at the contract as I do, I think that it was for the defendants to furnish the formula upon which the soap was to be manufactured, and that they had a right to insist that the soap should be manufactured by the plaintiff as they wished it; and the mere fact that the plaintiff imagined that the soap that it was making was a better soap than the soap that the defendants wanted seems to me was not a valid excuse for the plaintiff's refusal to make the soap as directed by the defendants.

I think, therefore, that the judgment should be reversed, and a new trial granted, with costs to the appellants to abide the event.

VAN BRUNT, P. J., concurs.