## ACTION TO ENFORCE AGREEMENT TO ASSIGN PATENT.

Circuit Court of Stark County.

FRANK TYSON ET AL V. MILLER-TYSON CO. ET AL.

Decided, March, 1912.

*Specific Performance—Parol Agreement to Assign Deeds for Patents Held Not Enforcible—Consideration to Inventor Lacking in Mutuality and Definiteness.*

Specific performance does not lie to enforce a parol agreement to assign deeds for certain patents to a company engaged in the exclusive manufacture and sale of the inventions on a royalty basis and in which company the inventor held stock and was employed as superintendent and to make experiments and secure new patents, where the elements of mutuality and definiteness are lacking, and no action was taken by the board of directors to carry the agreement into effect or authorizing any to make such an agreement, and the only consideration moving to the inventor was his interest in dividends earned and the assurance that the company would be financed and continued in business and he would be kept permanently in its employ.

*Pomerene, Ambler & Pomerene* and *Harry Frease,* for plaintiff in error.

*Lynch & Day, Taylor & Stewart* and *George H. Clark,* contra.

NIMAN, J. (of the Eighth Circuit, sitting in place of Shields, J.); POWELL, J., and VOORHEES, J., concur.

Error to court of common pleas.

This proceeding in error had its inception in an action brought in the court of common pleas by the Miller-Tyson Company against the plaintiffs in error, Frank Tyson, J. C. Corns and Atlee Pomerene, as trustee, to enforce by specific performance an alleged parol contract, whereby it is claimed the said Frank Tyson agreed to assign to the said Miller-Tyson Company his interest in certain letters patent.

The said J. C. Corns and Atlee Pomerene, as trustee, were made defendants in said action, on account of interest claimed by them in certain of the patents in controversy, and filed separate answers setting up the assignment to them by the said Frank Tyson of his interest in such of the patents as are there-

in enumerated, as collateral security for certain indebtedness, and asking that their respective interests be protected.

Shortly after the filing of the petition in the court of common pleas, said the Miller-Tyson Company became bankrupt, and the defendant in error, the Miller Pasteurizing Machine Company, subsequently acquired by valid assignment from the trustee in bankruptcy for said Miller-Tyson Company all such right as that company had in the patents described in the petition, and was duly substituted as plaintiff in said action.

The finding of the court below was in favor of the plaintiff and a decree of specific performance was entered against the defendant, Frank Tyson, except as to certain pending applications for patents, and the defendants, J. C. Corns and Atlee Pomerene, as trustee, were found to have no interest in the letters patent referred to in their respective answers as against the plaintiff.

A reversal of the finding and decree of the common pleas court is sought by this proceeding in error.

The alleged parol contract which formed the basis of plaintiff's action below is set forth in the petition in the following language:

. "That the said Tyson then and there, to-wit, on or about June 14, 1909, was the owner of a large amount of the capital stock of the plaintiff company, and that he then and there verbally agreed with the plaintiff in consideration of the fact that the plaintiff had paid all the fees and expenses of every kind necessary or useful for obtaining said last named letters patent including as well patent office fees as fees paid the solicitor employed to attend the work incident to the procuring of said letters patent, and in consideration that the plaintiff would continue manufacturing, experimenting, development and sale of said devices for pasteurizing milk under said letters patent, and all brine ice cream freezers under said letters patent respectively, and in consideration that plaintiff would defend suits brought for the infringement of said letters patent, to convey, transfer and assign to the plaintiff by proper instrument or instruments of writing his undivided half interest in the letters patent first above mentioned, to-wit:

"Nos. 804,687 and 804,688 and the said letters patent last above mentioned, to-wit: Nos. 903,030, 855,364, 903,028 and

923,609 for brine ice cream freezers and Nos. 853,659 and 896,959, 903,029 and 887,712 for pasteurizers together with any pending applications for patents or for any patents that he might thereafter secure upon their pasteurizers or brine ice cream freezers.''

It appears from the evidence that the Miller-Tyson Company, the original plaintiff below, was organized in January, 1906; that at that time Frank Tyson and H. B. Stewart were the joint owners of letters patent No. 804,687 for pasteurizing apparatus, and No. 804,688 for pasteurizing liquids, and Tyson was the owner of an invention for which letters patent 855,364 for ice cream freezers were subsequently secured; that on January 27, 1906, Tyson and Stewart entered into a written agreement with said Miller-Tyson Company whereby it was given the exclusive right to manufacture and sell in the United States the pasteurizing apparatus and pasteurizing liquids covered by said letters patent, together with all article or articles which are used or designed to be used in the pasteurizing, creamery, dairy, milk, butter or ice cream business which might be invented by said parties or either of them, or upon which they might obtain letters patent; that said Tyson and Stewart received as payment for the rights given under this agreement $100,000 of the common stock and $20,000 of the preferred stock of the said company; that they were further to receive a royalty of 10 per centum per annum of the gross sale price of the article or articles covered by the agreement; that said agreement provided that should the company fail for six consecutive months to manufacture a reasonable number of said pasteurizers or fail or discontinue manufacturing or go out of business, then in either event, all rights under said agreement should cease and determine as to the company and the interest in said patents revert to said Tyson and Stewart.

It further appears that Tyson became the superintendent of said Miller-Tyson Company and while in its employ made certain inventions and obtained letters patent therefor, and made application for others, all of which are included in the enumeration set forth in the petition; that the expense of ex-

perimenting and obtaining letters patent was borne by the company; that during the first year of the company's business, it was fairly successful, but in 1908 losses were incurred in excess of $35,000; that the company continued in financial trouble until on or about January 8, 1910, when bankruptcy proceedings were instituted against it and its affairs subsequently administered in the bankruptcy court.

The evidence discloses further that when the company began to lose money and its affairs became involved, the various persons who had invested money in the concern and who were members of the board of directors, became dissatisfied with the license agreement with Tyson and Stewart and expressed a strong desire to have the company acquire the absolute ownership of the patents described in the petition. Efforts were made through the agency of Mr. Stewart, who was the president of the company, to induce Mr. Tyson to agree to assign all of his interest in said patents to the company. Arguments of various kinds based chiefly upon the financial condition of the company and the benefits that would accrue to all concerned if such assignment were made, were advanced by Stewart and finally a conversation took place in the summer of 1909 between Stewart and Tyson, which together with a subsequent report thereof by Stewart to the members of the board of directors made in Tyson's presence, and with his claimed assent, constitutes the contract which it was sought to enforce in the court below by the decree of specific performance. Mr. Stewart's testimony of this conversation is as follows:

"It finally got to the point to where I said to Mr. Tyson some time in the latter part of May that the company could not proceed any further unless the patents were deeded over by him. At the time I told Tyson that it was the way to look at it; that the company would have to liquidate one way or the other and he wanted to know what assurances he would have and what benefit he would get out of it, and I said that he was a stockholder the same as we were and we would do the best we could to finance it; that if his machine that he was experimenting with would work, I felt that it would be a much easier matter to carry the thing along than if it did not work. I afterwards reported that to the board meeting."

In response to the question, "Did Mr. Tyson make a reply to that?" Mr. Stewart testified:

"He finally said that he would do what they wanted, transfer all his patents to the company that he had gotten up in this line of business. I told him that it would be more satisfactory to go ahead and that that would include anything he got up in the future pertaining to ice cream freezers or pasteurizers."

Mr. Stewart testifies concerning his report of this conversation to the board of directors in the following manner:

"Q. Did you repeat to the board the conversation you had with Mr. Tyson? A. I did.
"Q. Tell what you said to the board? A. I said that I had a number of conversations with Mr. Tyson; that he objected very seriously at first in turning these patents over, by reason of the fact that he did not know where he was going to stand; that he had offered to give us those patents with a trustee, to be used as collateral, and he made several other propositions but it was impossible to borrow money on the patents, and I explained that to Mr. Tyson and after we had gone over the situation, he consented to transfer the patents. * * * I took about a half hour to go over the whole thing and explained the negotiations, and I explained it very carefully and told them what Mr. Tyson's contention was. That he wanted to know if the company was going ahead and do business if he was assured of a position, and I stated to the board that I told him that the company would go ahead and that if his new device would work, we owed him everything that we could to finance it and keep it going, and that he could afford to do business with that understanding as well as we could, and if there was any way to finance it that everybody would make an effort. Different plans were discussed at the same meeting afterwards.
"Q. Let's not go to financing but continue with these negotiations you had with Mr. Tyson, and what you reported to the board? A. I have given the substance of it.
"Q. When you stated the circumstances to the board of your negotiations with Mr. Tyson, what if anything further was said? A. They seemed to be satisfied with the negotiations I had with him, and I asked Mr. Tyson if I stated it correctly and he said yes."

The testimony of Mr. Stewart as to his negotiations with Mr. Tyson for a transfer of the patents, while repeated and

amplified in other portions of his direct and cross-examination, does not materially modify that which is above quoted, and the testimony of the witnesses, other than Mr. Tyson, who heard the report to the board of directors, does not in our opinion substantially differ from the testimony of Mr. Stewart on that subject. Mr. Tyson, himself, has a different version of what was said between him and Mr. Stewart and as to the things said and done at the meeting of the board of directors. We do not deem it necessary to attempt to reconcile the conflicting testimony.

Accepting Mr. Stewart's testimony as above quoted, and considering all the other testimony bearing on the making of the alleged contract and the terms thereof, we are of opinion that the agreement relied upon is totally lacking in the essentials of a contract enforceable by a decree of specific performance and that there has been no such performance, in whole or in part, by said Miller-Tyson Company to require or justify such a decree.

It is a question of grave doubt whether the evidence established any agreement whatever with the company. No action was taken by the board of directors, by resolution or other formal notice, and the negotiations carried on with Mr. Tyson seem to have been as much on behalf of the members of the board of directors, as individuals and stockholders seeking to protect their own investments, as with the corporation. Mr. Stewart was asked the question: ''Did you receive any orders or instructions from the board as to what you should do touching the further negotiations with Mr. Tyson?'' His answer was: ''I had been requested by each member of the board to see what I could do with Mr. Tyson.''

This clearly shows no official authority to act on behalf of the company.

Again, in his testimony already quoted, Mr. Stewart said: ''I said that he was a stockholder the same as we were and we would do the best we could to finance it.''

However, if the doubt expressed be resolved in favor of the view that such agreement as was made was with the com-

pany, rather than with the individuals in control of it, the objection above indicated still exists.

The consideration claimed to be found in this agreement for Tyson's promise to assign his interest in the patents consists of the promise of the company to continue in business and to do the best it could to finance itself.

How long it was to continue in business and the extent of the financial aid it undertook to secure, is left wholly to conjecture. Could Tyson have compelled the company to specifically perform its part of the agreement by continuing in business, or by financing itself? Obviously, he could not, not only because it is impossible to say how long the business should be carried on, or the amount and character of the financial assistance the company should gather to itself, but because the undertaking is of such a character that a court of equity would not attempt to supervise its execution. The law governing such a situation is laid down in the syllabus of *Matthews* v. *Traction Co.*, 5 C.C. (N.S.), 179, affirmed without opinion, *Matthews* v. *Traction Co.*, 70 Ohio St., 436, as follows:

"A decree of specific performance will not be granted by a court of equity, where, in order to make the performance effective, continuous supervision will be required over personal acts of faith and diligence, and an exercise of judgment in meeting and adjusting relations to new conditions as they arise."

See, also, *Marble Co.* v. *Ripley*, 77 U. S. (10 Wall.), 339.

It is well established that specific performance will not be decreed where the remedy is not mutual. This principle is clearly stated in the syllabus of *Cooper* v. *Pena*, 21 Cal., 403, in the language following:

"Equity will not enforce the specific performance of a contract where the party asking the enforcement can not from the nature of the contract be compelled to perform it specifically on his part. In order that a specific performance of a contract may be compelled, the remedy, as well as the obligation, must be mutual, and as a general rule the question of mutuality is to be determined by the contract itself and is not affected by circumstances arising after the contract is made and the rights of the parties fixed."

See, also, *State* v. *Baum*, 6 Ohio, 383; *Chadwick* v. *Chadwick*, 121 Ala., 580; *Anson* v. *Townsend*, 73 Cal., 415.

The agreement relied upon in this case is clearly lacking in the element of mutuality of remedy, if not in mutuality of obligation. But it is claimed on behalf of the defendant in error that the Miller-Tyson Company performed its part of the agreement and that by reason of such performance the objection to want of mutuality of remedy which existed at the time the agreement was made is not available.

It is urged that the company did not go out of business, but continued until the institution of bankruptcy proceedings and that some money was put into the company after the agreement was made, and this is said to constitute such performance as will overcome the objection of want of mutuality.

It does not appear that prior to the negotiations resulting in the alleged agreement with Mr. Tyson the company took any action toward going out of business and afterwards its affairs seem to have drifted along in the same manner for a few months until the failure came.

Mr. Stewart in his direct examination was asked the question: "I will ask you what the company did by way of continuing business, its manufacturing and business obligations?" His answer was: "It continued as before."

After the agreement was made some money was borrowed by the company. Mr. Corns put in $3,870, but took collateral security therefor in the form of bills and accounts receivable. Mr. Stewart advanced $400, but the greater part of this was used to pay interest on one of the company's obligations on which he was also bound.

We fail to find any satisfactory proof that the company's continuance in business and the obtaining by it of the advencement of the sums of money mentioned were in performance of the terms of the agreement. All that the company did is as clearly to be referred to the performance of its obligations under the written contract hereinbefore mentioned and to the pursuit of its business in the regular and customary manner, as to performance under the parol agreement. The language of the

court in *Dayton, W. V. & X. Tpk. Co.* v. *Coy*, 13 Ohio St., 85, is applicable to this state of facts.   On page 94 it is said:

"It may be true, that, 'if a contract has been executed by the performance of the act forming the consideration for the promise, then it is no answer to an action to say that the plaintiff was not, by the terms of the original contract, bound to do the act, and there was consequently no mutuality of obligation' (Addison, Contracts, 35).   But this rule does not appear to be applicable where the act done only constitutes a part of the consideration and shows no assent to the terms of the contract. The objection of the want of mutuality is avoided, because the contract shows a request to do the act and an agreement to be bound upon its being done, and the doing the act is an assent to those terms.   This can not be said, where the terms of the contract require more than a silent performance of a part of the consideration, and shows that there was no intention to be bound, unless there was a mutual obligation to perform the other part of the consideration, in its nature concurrent.   The rule certainly can not apply in this case, where that which is alleged to have been part of the consideration and to have been performed, does not necessarily connect itself with the defendant, and may or may not have been done with the view of assenting to the promise of the defendant."

If, however, what was done by the company after the parol agreement was made is to be considered as having been done pursuant to the terms thereof, and that it would not otherwise have been done, there still remains the objection that it was at most only part performance.   The nature of the undertaking on the part of the company is so vague and indefinite as to render it impossible to say what acts would constitute full performance by it, and for this reason alone, a decree of specific performance against the other party might well be refused.   It certainly can not be said, in any event, that the Miller-Tyson Company, by merely passively continuing in business for a few months and then ending its existence in the bankruptcy court, has so far performed what was agreed by it to be done as to establish its right to a decree for specific performance.

Equity will decree specific performance to one party to a contract only when the other contracting party is tendered

full performance or can be made secure in the benefits of his contract. *Richards* v. *Doyle,* 36 Ohio St., 37.

In *Marietta & C. Ry.* v. *Telegraph Co.,* 38 Ohio St., 24, it was held that:

"Equity will not compel specific performance, where the benefits of the contract can not be realized in accordance with its terms."

It is not claimed that any further performance of the agreement to continue in business and to exert efforts in improving the financial affairs of the company is possible, or that such further performance was tendered and a willingness and ability shown to perform fully. The contention of the defendant in error is that the mere continuance in business of the Miller-Tyson Company, with such acts on its part as were incident thereto, constituted full performance.

As already indicated, we are not prepared to say how long a continuance in business and how great and successful an effort to raise money would support the claim of full performance, but we are strongly of the opinion that what was done by the company did not amount to such performance.

The right of the plaintiff below to the relief sought must rest upon the contract set forth in the petition and the proof in support thereof and is not in any way affected by any equitable features that may have existed under the written license contract before referred to. Much evidence was introduced as to the condition of the company prior to the making of the alleged parol agreement and the considerations thereof, and intimations have been made in the arguments and briefs of counsel for defendant in error that the unfortunate condition of the company was due to some fault on the part of Mr. Tyson. The only possible bearing these matters can have in this case is in connection with the determination of the question whether the agreement on which the action is based was made, and incidentally it is supported by a consideration. No equity can be enforced in this action against Mr. Tyson arising out of his dealings with the company under said written contract.

For the reasons assigned, we are of opinion that the court of common pleas erred in finding for the plaintiff and in entering a decree of specific performance against the defendant, Frank Tyson, and in finding that the defendants, J. C. Corns and Atlee Pomerene, trustee, had no interest in the patents described in their respective answers, as against the plaintiff. The judgment of the court below is, therefore, reversed, and the judgment which said court ought to have rendered will be rendered by this court, and the petition dismissed.

---

### POLICE JURISDICTION IN MISDEMEANORS.