## San Juan Racing & Sporting Club et al., Peticionarios, *v.* Foote, Juez de Distrito, Demandado.

Solicitud para que se expida un auto de *certiorari* contra la Corte de Distrito de San Juan, Distrito Primero, Hon. Charles E. Foote, Juez.

No. 363.—Resuelto en noviembre 9, 1922.

*Injunction—Specific Performance.*—Como un *injunction* para impedir el quebrantamiento de un contrato generalmente surte el efecto de una orden para su cumplimiento específico, y en ese caso el *injunction* es, por su naturaleza, mandatorio, no se concederá dicho remedio para impedir la violación de un contrato cuyo cumplimiento no habría de exigirse específicamente; especialmente cuando se trata de un contrato unilateral, a cuyo cumplimiento específico la parte obligada por el contrato no tendría derecho, o cuando el contrato implica una sucesión de actos cuyo cumplimiento no puede efectuarse mediante una transacción, exigiendo, por el contrario, una serie de transacciones y una inspección prolongada.

Id.—Hipódromos.—Sólo el Estado puede obtener de una corte la restricción de los actos *ultra vires* de una corporación pública, y en el caso de una corporación privada, además del Estado pueden obtenerla los accionistas dentro de ciertas limitaciones; y cuando se trata de corporaciones dedicadas al mantenimiento y explotación de hipódromos, generalmente las cortes no intervendrán en los acuerdos que tomen sus juntas directivas respecto al orden interior del deporte.

Id.—Apelación—*Certiorari.*—El principio general de que habiendo el recurso ordinario de apelación no cabe el de *certiorari* no es absoluto, pues si aquél no es tan adecuado, rápido y eficaz como éste lo sería, entonces cabe conceder el *certiorari*, aun después de establecido recurso de apelación.

Los hechos están expresados en la opinión.

Abogado de los peticionarios: *Sr. L. Feliú.*

Abogado de la parte contraria: *Sr. R. Rivera Zayas.*

El Juez Asociado Sr. Franco Soto, emitió la opinión del tribunal.

En la Corte de Distrito de San Juan, Primer Distrito, Jesús Mediavilla y Francisco Mesa interpusieron una demanda solicitando la anulación de ciertos acuerdos tomados por la corporación peticionaria, y mediante los cuales se suspendió al primero el derecho, por seis meses, de inscribir sus caballos para correr en el hipódromo de la peticionaria; prohibiéndole también la inscripción de la yegua "Dotty" y expulsando para siempre del hipódromo a su *jockey* Francisco

Mesa, otro de los demandantes. Como remedio auxiliar los demandantes pidieron en la misma demanda que se librara un auto de *injunction preliminar* (*pendente lite*) ordenando a la peticionaria que se abstuviera de poner en vigor los referidos acuerdos y mandando que se permitiera la inscripción de los caballos de Mediavilla, la inscripción de la yegua "Dotty" y la del *jockey* Francisco Mesa para las carreras que la peticionaria celebrara en su hipódromo mientras se sustanciaba el litigio iniciado para la anulación de los repetidos acuerdos.

La corte inferior en 11 de mayo de 1922 decretó el auto de *injunction* preliminar, y la parte dispositiva del mismo literalmente dice:

"Por tanto, de acuerdo con la Ley de *Injunctions,* y previa fianza de diez mil dollars ($10,000) que ha sido prestada por los demandantes y aprobada por esta corte, expido el presente auto de *injunction* preliminar contra los demandados San Juan Racing & Sporting Club y su juez de inscripciones, ordenándoles que sin excusas de ninguna clase se abstengan por sí o por sus agentes y empleados de cumplimentar los acuerdos a que se refiere este auto, y se les ordena que permitan y hagan la inscripción de los caballos propiedad del Sr. Mediavilla, o por él representados, para las carreras que se han de verificar el próximo domingo, y las que se verificaren mientras se resuelve este pleito en definitiva; y que asimismo permitan la inscripción y empleo como *jockey* del demandante, Francisco Mesa, para las mismas carreras mencionadas y durante se resuelva este asunto en definitiva; apercibiéndoles de que la desobediencia a este auto será castigada como desacato por este tribunal. Y dichas inscripciones se entienden sujetas a la ley y reglamentos vigentes.—Dado bajo mi firma y sello de esta corte, hoy 11 de mayo de 1922, San Juan, Puerto Rico.—Charles E. Foote, Juez de la Corte de Distrito de San Juan, Primer Distrito.—Certifico: C. Marrero, Secretario."

Posterior a la anterior resolución, la misma corte dictó, con fecha 26 de mayo, 1922, otra orden dirigida a la corporación peticionaria, requiriendo a sus directores para que comparecieran ante dicha corte a exponer las causas que tuvieran por las cuales no debían ser castigados por desacato o

desobediencia a la orden de *injunction* preliminar que había decretado, consistente el tal desacato en haberse negado la peticionaria a inscribir algunos de los caballos del demandante Mediavilla y negarse a la inscripción del *jockey* Francisco Mesa para las carreras que habían de celebrarse el 28 de mayo de 1922.

Contra los procedimientos que se dejan relacionados la corporación peticionaria ha establecido ante esta corte el presente recurso de *certiorari*, solicitando la revisión de los mismos y para que deje sin efecto ni valor alguno la orden preliminar de *injunction*, así como la de mostrar causa, decretadas respectivamente en 11 y 26 de mayo de 1922.

La petición alega como un fundamento esencial que la corte inferior actuó al dictar la orden preliminar de *injunction* en exceso de su jurisdicción sin tener facultad ni poder algunos para ello, y en violación de la ley y reglamentos que gobiernan el procedimiento en las acciones civiles; y se aducen, además, diversas razones legales que consideraremos en el curso de esta opinión.

Es ya elemental en materia de *certiorari*, que no podemos considerar en la resolución de este recurso, nada más que aquellos puntos que se relacionan con la falta de jurisdicción de la corte inferior o con la violación de reglas que encauzan las acciones en los procedimiento civiles. Como consecuencia nada podríamos resolver ahora en cuanto a los méritos del caso ni respecto a cuestiones de fondo o apreciación de los hechos. Así es que para determinar fijamente si ha existido o no falta o exceso de jurisdicción al expedir la corte inferior la orden preliminar de *injunction*, se nos hace necesario hacer un examen de los términos de la demanda en la acción principal y ver en qué se ha fundado dicha corte para ejercer su poder jurisdiccional.

A este efecto, es importante reproducir, en esencia, de dicha demanda, las siguientes alegaciones: que el demandante Mediavilla es un dueño de caballos, los cuales tiene inscritos

en la Comisión Hípica Insular y además ha satisfecho todas las licencias y los derechos correspondientes exigidos por la ley y los reglamentos, que habiendo obtenido las licencias y pagado los derechos exigidos por la ley y los reglamentos, adquirió el derecho de inscribir y correr caballos en el hipódromo que mantiene y explota la corporación peticionaria sujeto, sin embargo, a las condiciones impuestas por la ley y reglamentos; que Mediavilla ha invertido un capital de veinte mil dólares en el negocio de caballos y cuadra; que sus caballos son especiales de carrera y no podrán dedicarse a otro fin con beneficio alguno y que la corporación peticionaria, sin tener facultades para ello, ha adoptado el acuerdo de suspenderlo en su derecho de inscribir caballos y correrlos en dicho hipódromo por seis meses y que amenaza poner en práctica dichos acuerdos, ocasionándole perjuicios irreparables al demandante; que Francisco Mesa, otro de los demandantes, es un *jockey* debidamente autorizado por la ley y reglamentos para correr los caballos de Mediavilla y que sin él no podría correrlos: que también la corporación peticionaria tomó el acuerdo de expulsar del hipódromo al referido *jockey;* y que asimismo, si este acuerdo se llevara a cabo durante la tramitación del pleito, los demandantes habrían de sufrir daños irreparables; que dichos acuerdos fueron tomados sin haberse oído a los demandantes, quienes han cumplido las leyes y reglamentos que rigen las carreras en el citado hipódromo y no han cometido violación ninguna de los mismos, en virtud de la cual pudieran perder sus derechos a participar en las carreras que se celebren.

No nos podemos salir del círculo en que giran las anteriores alegaciones y, atendiendo solamente a ellas, cabe preguntar: ¿cuáles son los hechos que se exponen, no para descubrir si existe o no una causa de acción, sino para dar a la corte inferior el poder de oir y determinar la materia en controversia, o sea, el poder jurisdiccional de dicha corte, y por tanto, su facultad para expedir el *injunction* preliminar?

Los demandantes argumentan en su alegato que en su demanda no se alega la existencia de ningún contrato y que la demanda se basa en el principio universalmente aceptado de que toda persona que sufre perjuicios irreparables con motivo de un acto *ultra vires* de una corporación, tiene derecho a un *injunction* para impedir que la corporación siga realizando los actos que pretende realizar sin facultad ninguna para ello.

Creemos que existe una confusión en la manera en que consideran la situación del caso los demandantes.

No debemos perder de vista que la controversia estriba sobre un remedio preliminar, como medida auxiliar, de una acción principal; y en esta acción es que hay que buscar la materia propia para definir la jurisdicción de la corte inferior. Las relaciones contractuales siempre han de surgir por actos de la ley misma o por voluntad de las partes, que es la ley del contrato. No es la discusión del nombre o naturaleza de un contrato lo que vamos a poner en claro; es la existencia o el nexo jurídico que los demandantes, en una forma u otra, tratan de establecer con la corporación peticionaria al exigir de ella el cumplimiento de una obligación específica. Esta obligación se traduce, según la demanda, en el derecho que alegan tener los demandantes de correr sus caballos en el hipódromo de la demandada, así como el del *jockey* a correrlos. Son derechos, que creen exigibles los demandantes, sin alegar sus deberes para con la peticionaria, siendo esta la forma contractual que se expone existente entre los partes. De manera que cuando se alega además que la corporación peticionaria tomó acuerdos pretendiendo suspender al demandante Mediavilla, por seis meses, para correr sus caballos en el hipódromo que mantiene y explota la peticionaria, así como la expulsión de su *jockey,* no se hace otra cosa sino alegar que un contrato fué quebrantado y roto por la corporación peticionaria, y el *injunction pendente lite* que se ha de-

cretado no tiene otro propósito sino operar como un decreto para su cumplimiento específico.

"Un *injunction* para impedir la violación de un contrato con frecuencia produce el efecto, para todos los fines y propósitos, de una orden para su cumplimiento específico." *Beach* sobre *Injunctions,* tomo 1, pág. 444.

Nuestra Ley de *Injunctions* aprobada en marzo 8, 1906, en su sección 4ª dice:

"Sección 4.—No podrá otorgarse un *injunction:*

\*     \*     \*     \*     \*     \*     \*

"4. Para impedir el quebrantamiento de un contrato cuyo cumplimiento no habría de exigirse específicamente."

"Y esta regla de que el *injunction* como remedio para el cumplimiento específico será negado cuando los hechos que se alegan en la demanda no muestran un caso que dé derecho al demandante al cumplimiento específico, es especialmente rigurosa cuando se pide un *injunction* mandatorio pues tal *injunction* raras veces se concede antes de la vista final." *Beach* sobre *Injunctions,* tomo 1, pág. 444.

El comentario anterior refleja enteramente una situación semejante a la que está siendo objeto de nuestra consideración. Esa es la regla que cabe aplicar al presente caso. El *injunction* decretado podría ser objeto de discusión en cuanto a su naturaleza, pero es mandatorio en sus efectos. Implícitamente ha quedado aceptada la regla que citamos por los demandantes cuando de una manera colateral tratan de mantener el cumplimiento de una obligación por parte de la corporación peticionaria, basándose en acuerdos que alegan *ultra vires,* pero que surtiría el efecto de impedir quebrantar una obligación específica. Son, pues, relaciones contractuales las que se exponen en la demanda, de las que, sin embargo, no aparece una mutualidad de obligaciones entre las partes. Es un derecho unilateral el que reclaman los demandantes. Es algo así como una opción en sus efectos cuando hacen depender la obligación de la peticionaria (de tener que admitir caballos y *jockey* del demandante Mediavilla) del hecho de su

inscripción y pago de licencia en la Comisión Hípica Insular sin alegar los deberes recíprocos de dichos demandantes

"No se concederá un *injunction* como remedio en una acción para el cumplimiento específico de un contrato unilateral, y por tanto no se decretará para que sea específicamente cumplido, como en el caso en que el demandado tiene una mera opción de compra pues no tiene ninguna obligación de comprar." *Beach* sobre *Injunctions*, tomo 1 pág. 449.

En *Wood* v. *Dickey,* 17 S. E. Rep. 818, la corte dice:

"Una corte de equidad en Virginia no decretará el cumplimiento específico de un contrato si no existe mutualidad tanto en la obligación como en el remedio. Ambas partes, por el propio contrato, deben tener derecho para obligar al cumplimiento específico del mismo, de otro modo la equidad no lo hará cumplir.

"En el caso de Duvall v. Myers, 2 Md. Ch. 401, la corte expresa que el derecho al cumplimiento específico de un contrato en lo que concierne a la mutualidad, depende de si el contrato mismo es obligatorio para ambas partes; de modo que a solicitud de una de ellas contra la otra la corte obligaría su cumplimiento específico. Rider v. Gray, 69 Am. Dec. 135; Marble Co. v. Ripley, 10 Wall. 359."

Además, la materia envuelta en la controversia de este asunto, está representada por una serie de actos sucesivos que implican una solución de continuidad. El hipódromo de la peticionaria no es mantenido para celebrar un solo acto; son sucesivas y continuadas carreras de caballos las que en él se celebran; de manera que el derecho del Sr. Mediavilla a correr sus caballos y a inscribir su *jockey* no se concreta a una carrera ni se consume por una sola transacción, según así resulta de la demanda, sino que comprende una sucesión de las mismas lo que necesariamente había de exigir una larga y prolongada vigilancia de la corporación peticionaria. Siendo este otro aspecto de este caso, la jurisprudencia de los tribunales americanos ya tiene decidido que una situación jurídica de tal naturaleza no es materia de *injunction* y el quebrantamiento de una transacción semejante no puede ser objeto de *injunction* para impedir el incumplimiento del contrato.

*Beach* sobre *Injunctions,* tomo 1, pág. 445, dice:

"La regla general no es decretar el cumplimiento específico de contratos en los cuales en sus términos se estipula una sucesión de actos cuyo cumplimiento no puede efectuarse mediante una transacción sino que serán continuos y exigirán inspección prolongada. Fry See Perf. 69; Waterman Spec. Perf. págs. 68–69; *Blacketh* v. *Pates* L. R. 1 Ch. App. 117; *Powell Duffryn Coal Co.* v. *Taffvale R. Co.* L. R. 9 Ch. App. 331; *Blanchard* v. *Railroad Co.* 31 Mich. 43; *Atlanta etc. R.* v. *Speer,* 32 Ga. 550; *Danforth* v. *Philadelphia, etc. R. Co.,* N. J. Eq. 12."

En relación con la doctrina enunciada, nada más análogo al presente caso que el de una corporación de ferrocarriles que conviene suministrar a una compañía de expreso, de tiempo en tiempo, acomodación, vagones, trenes extras y asistencia a sus empleados cuando fuese necesario. En el caso de *Fargo* v. *New York etc. R. Co.* 23 *N. Y. Supp.* 360, se dice por la corte:

"Por tanto, no se concederá un *injunction* para impedir el incumplimiento de un contrato por el cual una compañía de ferrocarriles se comprometió a suministrar a una compañía de expreso, de tiempo en tiempo, las indispensables comodidades y alojamiento, carros y trenes extras y ayuda de empleados cuando fuese necesario."

Asimismo es similar la doctrina que se deja sentada en el caso de *Age Publishing Co.* v. *Western Tel. Co.,* 83 Ala. 498, en donde se declara:

"No procederá el *injunction* contra la violación de un contrato por la Prensa Asociada de dar el derecho exclusivo de publicar sus despachos por un término indefinido, en ciertos sitios, a una compañía editora en compensación a los servicios de esta última como corresponsal y agente de la primera, toda vez que el contrato no podía ser obligado a cumplir específicamente por el demandante."

La jurisprudencia de esta corte ya había reafirmado el principio de la falta de jurisdicción o poder de una corte cuando el propósito es impedir el quebrantamiento de un con-

trato cuyo cumplimiento no había de exigirse específicamente, interpretando en tal sentido el inciso 4o. de la sección 4 de nuestra Ley de *Injunctions* más arriba citada. Nos referimos al caso de *Laura Núñez* v. *Soto Nussa, Juez de Distrito,* 14 D. P. R. 199.

El hábil abogado de los demandantes conviene y reconoce que en el caso de la Núñez el contrato cuyo quebrantamiento quería reprimirse por medio de un *injunction* no podía ejecutarse específicamente y que era claro y manifiesto que por la misma Ley de *Injunctions* la corte de distrito carecía de poder y de jurisdicción para decretar un *injunction* de esa naturaleza; pero alega al mismo tiempo que el presente caso es completamente distinto ya que la demanda se basa en el principio universalmente aceptado de que toda persona que sufre perjuicios irreparables con motivo de un acto *ultra vires* de una corporación, tiene derecho a un *injunction* para impedir que la corporación siga realizando los actos que pretende realizar sin facultad ninguna para ello. El principio que de un modo tan general se invoca, no tiene aplicación a casos de la naturaleza del que debatimos, y el alcance y efectos de una doctrina como la enunciada, así como el error de los demandantes al intentar sostenerla en este caso, podemos apreciarlo de las siguientes palabras:

"Según el criterio que prevalece una corte de equidad a solicitud del Estado mediante el debido funcionario puede restringir a una corporación pública o privada de que abuse de las facultades que le han sido conferidas o pretenda ejercitar facultades que no tiene, y parece que tal remedio puede concederse en una acción seguida por un accionista de una corporación privada, pero no en la acción que entable un extraño, ni se concederá en beneficio de un accionista cuando el efecto ha de ser suspender el negocio social y hacer imposible su conducción por los métodos corrientes. La regla respecto a la prevención de daños irreparables solamente, no tiene aplicación a los actos de la corporación que carecen enteramente de autoridad y para los cuales no hay remedio adecuado en la ley, y las corporaciones serán restringidas mediante *injunction* de poder actuar sin

autoridad en perjuicio de otros, como por ejemplo, cuando una compañía de ferrocarriles pretende levantar su vía sobre la propiedad de un individuo particular sin la debida autoridad. En tales casos la cuestión no es meramente la de un daño sino más bien de una usurpación de un derecho." 14 R. C. L. 369.

Puede notarse que en la demanda nada se alega que pueda estar en concordancia con los principios que se desenvuelven en la doctrina que acabamos de insertar. No son, pues, los demandantes quienes puedan estar autorizados para pedir la nulidad o discutir el alcance de los acuerdos tomados por la corporación peticionaria, ya que ellos son extraños a dicha corporación; y siendo ello así, y concretándonos al caso que es objeto de nuestra discusión, El Pueblo de Puerto Rico, o los accionistas en su caso, serían las partes legítimas para atacar la legalidad de tales acuerdos cuando se crea que ellos son abusivos o *ultra vires;* y la acción del primero podría alcanzar, si fuese necesario, la cancelación de la franquicia de la peticionaria, así como de cualquier otra corporación que abusara de sus poderes. No son, por tanto, los demandantes los que podían suplantar la acción del Pueblo de Puerto Rico o la de los accionistas al intentar atacar los acuerdos tomados por la corporación peticionaria ni tampoco sus relaciones contractuales pueden poner en sus manos un remedio como el *injunction;* porque además de las razones ya expresadas, cualquiera que fuera la interpretación que diéramos a tales relaciones, es un principio que prevalece en relación con las asociaciones que en los Estados Unidos se dedican a los mismos o análogos deportes, que los dueños de caballos y sus *jockeys* quedan sometidos a los acuerdos que toman los *boards* ejecutivos de dichos asociaciones, y generalmente, contra esos acuerdos no procede la intervención de las cortes. Si fuera de otro modo dichas corporaciones carecerían de toda fuerza moral y de facultades necesarias para corregir las infracciones y faltas que cometieran los dueños de caballos y sus *jockeys,* y una situación semejante basada en un poder nega-

tivo de tal naturaleza en que va envuelta la sana moral de un deporte y que afecta al bien público en general estaría en contra del poder de policía y de la moral, y en esas condiciones, un remedio esencialmente equitativo como lo es el *injunction,* jamás debía decretarse.

La apelación que se alega en la petición que ha sido establecida contra la orden preliminar de *injunction* parece que sería un obstáculo para tomar en consideración y resolver la petición de *certiorari.* Sin embargo, el principio general de que habiendo el recurso ordinario de apelación no cabe el de *certiorari* no es tan absoluto. En el caso de la *Núñez* v. *Soto Nussa, supra,* fué una cuestión muy bien debatida y se resolvió que en dicho caso concreto la apelación no era un obstáculo para que procediera el auto de *certiorari.* En este caso se cita la regla adoptada por la Corte Suprema de Missouri, que dice:

"La existencia de un remedio mediante apelación o recurso por causa de error no es suficiente para constituir un obstáculo al auto. de *certiorari,* a menos que dicho remedio sea adecuado para llenar los requisitos del caso; es decir, que sea igualmente beneficioso, rápido y suficiente, no meramente un remedio que algún tiempo en lo futuro efectuara la revocación de la sentencia recurrida, sino un remedio que librará al peticionario, de un modo rápido, de los efectos perjudiciales de la sentencia y de los actos de la corte o tribunal inferior."

Este caso está comprendido dentro de la anterior doctrina, porque habiendo la corte inferior actuado en exceso de su jurisdicción al decretar el *injunction* preliminar, y estando amenazada la peticionaria de un procedimiento por desacato, el recurso de apelación representaría en este caso un medio tardío que no sería tan adecuado, rápido y eficaz como lo es el *certiorari,* para librar de este modo, en bien de la justicia, a la peticionaria de los actos de la corte inferior.

Como conclusión a todo lo expuesto, deben revocarse y anularse la orden de *injunction* preliminar de 11 de mayo de

1922 y la de 26 de mayo de 1922 para mostrar causa por desacato.

> *Anulada la orden de* injunction *preliminar y la orden para mostrar causa por desacato.*

Jueces concurrentes: Sres. Presidente del Toro y Asociados Aldrey y Hutchison.

El Juez Asociado Sr. Wolf no intervino en la resolución de este caso.